# EXHIBIT A

**STATE OF TENNESSEE**
**Department of Commerce and Insurance**
**500 James Robertson Parkway**
**Nashville, TN 37243-1131**
**PH - 615.532.5260, FX - 615.532.2788**
**brenda.meade@tn.gov**

April 4, 2011

Mitsui Sumitomo Ins U S A, Inc.                    Certified Mail
15 Independence Blvd.                              Return Receipt Requested
Warren, NJ 07059                                   7010 2780 0001 2571 2429
NAIC # 22551                                       Cashier # 2563

Re:    Gibson Guitar Corp.   V.   Mitsui Sumitomo Ins U S A, Inc.

       Docket # 11-390-I

To Whom It May Concern:

Pursuant to Tennessee Code Annotated § 56-2-504 or § 56-2-506, the Department of
Commerce and Insurance was served March 30, 2011, on your behalf in connection with the
above-styled proceeding.  Documentation relating to the subject is herein enclosed.

Brenda C. Meade
Designated Agent
Service of Process

Enclosures

cc: Chancery Court Clerk
    Davidson County
    One Public Square, Suite 308
    Nashville, Tn 37201

| STATE OF TENNESSEE 20TH JUDICIAL DISTRICT CHANCERY COURT | SUMMONS | CASE FILE NUMBER 11-390 I |
|---|---|---|

| PLAINTIFF Gibson Guitar Corp. | DEFENDANT Mitsui Sumitomo Insurance Company of America, Mitsui Sumitomo Marine Management (U.S.A.), Inc., Continental Insurance Company, Willis of Tennessee, Inc., and Willis of Michigan, Inc. |
|---|---|

TO:    (NAME AND ADDRESS OF DEFENDANT)

Mitsui Sumitomo Marine Management (U.S.A.), Inc.
c/o Commissioner of the Tennessee Department of
Commerce and Insurance
ATTN:   Service of Process
500 James Robertson Parkway
Nashville, TN 37243

List each defendant on a separate summons.

Method of Service:

☐ Certified Mail
☐ Davidson Co. Sheriff
☑ *Comm. Of Insurance
☐ *Secretary of State
☐ *Out of County Sheriff
☐ Private Process Server
☐ Other
   *Attach Required Fees

**YOU ARE SUMMONED TO DEFEND A CIVIL ACTION FILED AGAINST YOU IN CHANCERY COURT, DAVIDSON COUNTY, TENNESSEE. YOUR DEFENSE MUST BE MADE WITHIN THIRTY (30) DAYS FROM THE DATE THIS SUMMONS IS SERVED UPON YOU. YOU MUST FILE YOUR DEFENSE WITH THE CLERK OF THE COURT AND SEND A COPY TO THE PLAINTIFF'S ATTORNEY AT THE ADDRESS LISTED BELOW. IF YOU FAIL TO DEFEND THIS ACTION BY THE ABOVE DATE, JUDGMENT BY DEFAULT CAN BE RENDERED AGAINST YOU FOR THE RELIEF SOUGHT IN THE COMPLAINT.**

| Attorney for plaintiff or plaintiff if filing Pro Se: (Name, address & telephone number) Steven A. Riley Tim Harvey Riley Warnock & Jacobson, PLC 1906 West End Avenue Nashville, TN 37203 | FILED, ISSUED & ATTESTED    MAR 2 3 2011 CRISTI SCOTT, Clerk and Master By:                1 Public Square                    Suite 308                    Nashville, TN 37201 Deputy Clerk & Master |
|---|---|

**NOTICE OF DISPOSITION DATE**

The disposition date of this case is twelve months from date of filing.  The case must be resolved or set for trial by this date or it will be dismissed by the Court for failure to prosecute pursuant to T.R.C.P. 41.02 and Local Rule 18.

If you think the case will require more than one year to resolve or set for trial, you must send a letter to the Clerk and Master at the earliest practicable date asking for an extension of the disposition date and stating your reasons. Extensions will be granted only when exceptional circumstances exist.

| TO THE SHERIFF: | DATE RECEIVED Sheriff |
|---|---|

***Submit one original plus one copy for each defendant to be served.

ADA Coordinator, Cristi Scott (862-5710)

## IN THE CHANCERY COURT FOR DAVIDSON COUNTY, TENNESSEE

GIBSON GUITAR CORP.,

        Plaintiff,

        v.

MITSUI SUMITOMO INSURANCE
COMPANY OF AMERICA, MITSUI
SUMITOMO MARINE MANAGEMENT
(U.S.A.), INC., CONTINENTAL
INSURANCE COMPANY, WILLIS OF
TENNESSEE, INC., and WILLIS OF
MICHIGAN, INC.

        Defendants.

Civil Action No. _11-390-I_

JURY DEMAND

### COMPLAINT

Plaintiff, Gibson Guitar Corp. ("Gibson"), brings this Complaint against Defendants Mitsui Sumitomo Insurance Company of America, Mitsui Sumitomo Marine Management (U.S.A.), Inc., Continental Insurance Company ("CNA"), Willis of Tennessee, Inc., and Willis of Michigan, Inc., and states as follows:

### Introduction

1.      This is a first-party insurance coverage dispute arising out of a catastrophic $17 million property loss Gibson sustained at its Electric Division facility in Nashville, Tennessee as a result of the May 2010 heavy rains and ensuing flooding in and around greater Nashville. At the time of its loss, Gibson had primary and excess warehouse insurance for its finished goods, gear, work in progress and raw materials at its 641-643 Massman Drive building, providing it with not less than $25,000,000 in insured limits. Mitsui Sumitomo Insurance Company of America, Mitsui Sumitomo Marine Management (U.S.A.), Inc., and CNA, however, have

- 1 -

refused to cover Gibson's entire loss.

## The Parties

2.     Plaintiff Gibson is a Delaware corporation with its principal place of business located at 309 Plus Park Boulevard, Nashville, Tennessee.

3.     Defendant CNA is an insurance company organized under the laws of the State of Pennsylvania with its principal place of business at 333 S. Wabash Ave, Chicago, Illinois.

4.     Defendant Mitsui Sumitomo Insurance Company of America is an insurance company organized under the laws of the State of New York with its principal place of business at 15 Independence Boulevard, Warren, New Jersey.

5.     Defendant Mitsui Sumitomo Marine Management (U.S.A.), Inc. is a corporation organized under the laws of the State of New York with its principal place of business at 560 Lexington Avenue, New York, New York.  Because Mitsui Sumitomo Insurance Company of America has no employees, Mitsui Sumitomo Marine Management (U.S.A.), Inc. provides all underwriting, loss control, claims handling, human resources, legal, financial and information technology services acting as, and on behalf of, Mitsui Sumitomo Insurance Company of America.  Mitsui Sumitomo Insurance Company of America and Mitsui Sumitomo Marine Management (U.S.A.), Inc. are collectively referred to herein as ("MSI").

6.     Defendant Willis of Tennessee, Inc. is a corporation organized under the laws of the State of Tennessee with its principal place of business located at 26 Century Boulevard, Nashville, Tennessee.

7.     Defendant Willis of Michigan, Inc. is a corporation organized under the laws of the State of Michigan with its principal place of business at 32255 Northwestern Highway, Farmington Hills, Michigan.  Willis of Tennessee, Inc. and Willis of Michigan, Inc. are referred

- 2 -

to herein collectively as ("Willis"). Upon information and belief, Willis regularly placed insurance policies underwritten by CNA and MSI.

**Jurisdiction and Venue**

8. This Court has jurisdiction over this matter pursuant to Tennessee law, including but not limited to Tenn. Code Ann. § 16-11-102.

9. This Court has jurisdiction over all Defendants because they: (1) entered into contracts in this state, (2) directed tortious conduct at Gibson, which maintains its principal place of business in this state, (3) engaged in business within this state (4) are registered to do business in this state, (5) are licensed to sell insurance in this state and/or (6) are located within this state.

10. Venue is proper in this Court because the cause of action arose in Davidson County, a substantial part of the property that is the subject of the Complaint is situated there, and Defendant Willis conducts business and is located there.

**Gibson's Marine Insurance, Warehouse Endorsement and Excess Stock Insurance**

11. The warehouse complex owned by Gibson at the center of this controversy is a single building containing both a manufacturing space where Gibson manufactures its guitars and a storage area used to store manufactured stock (i.e., Gibson branded guitars) and other goods and merchandise. For convenience purposes, the building (the "Massman Drive Facility") has two street addresses: 641 Massman Drive and 643 Massman Drive. Gibson treats this location as a single unit for purposes of valuing its contents and stock.

12. Beginning in 2003, Willis procured for Gibson a "stock throughput" marine insurance contract with CNA (the "CNA Policy") under which CNA agreed to provide marine open cargo insurance which extended to warehouse/finished stock at specified locations, including Gibson's Electric Division. A true and correct copy of the CNA Policy is attached

- 3 -

hereto as Exhibit A.

13.     Beginning in 2004, Willis procured for Gibson a contract of excess insurance with

MSI, immediately above CNA's primary layer.  A binder denominated "Confirmation of Excess

Stock Insurance," effective as of January 1, 2010 (the "MSI Binder"), is further described below.

A true and correct copy of the MSI Binder is attached hereto as Exhibit B.  The CNA Policy and

the MSI Binder are collectively referred to as the "Marine Insurance Program."

14.     Thus, Willis agreed to procure insurance of at least $25 million for the Massman

Drive Facility and represented to Gibson that it had done so.  Gibson reasonably relied upon

these representations and paid the premiums for the Marine Insurance Program.

15.     The CNA Policy, policy number OC 24-4422 00 (the "CNA Policy"), paid for by

Gibson, provides primary insurance coverage for:

> Goods and/or merchandise and/or Property of every
> description incidental to the Assured's business consisting
> principally of, but not limited to musical instruments, raw
> materials and similar products.

16.     The CNA Policy's "Conditions of Coverage" further states that:

> Unless otherwise specified below, all goods and/or
> merchandise and/or property are insured:
>
> (A) against all risks of physical loss or damage from any
> external cause whatsoever, except those risks that may be
> excluded by the F.C. & S. warranty S.R. and C.C. warranty
> and/or other warranties or exclusions specified in this
> policy, unless covered elsewhere herein, irrespective of
> percentage

17.     The CNA Policy contains an "Errors and Omissions" clause, which states:

> This policy shall not be vitiated by any unintentional delay,
> error, omission or oversight in making any declaration that
> is required to be made under and provision contained in or
> endorsed on this policy provided a correct declaration is
> communicated to this Assurer as soon as practicable after
> the delay, error omission or oversight becomes known to

- 4 -

the Assured's Corporate Risk Manager or equivalent, and premium paid, if required by this Assured.

18. The CNA Policy contains a "Control of Damaged Goods" clause, which states:

> Notwithstanding anything to the contrary contained elsewhere in this policy it is understood and agreed that in case of damage to goods and/or merchandise and/or property insured under the policy the Assured is to retain full and absolute discretion and control over the disposition of all such goods and/or merchandise and/or property. It is understood that the Assured shall be the sole judge as to whether disposal or sale of such goods and/or merchandise and/or property is detrimental to its interest. This assurer shall be given the opportunity to have a representative in attendance.

19. The CNA Policy includes Endorsement No. 8, a "2010 Warehouse Endorsement" that states in relevant part:

> . . . this policy is extended, subject to all terms and conditions, to cover goods and/or merchandise incidental to the business of the Assured while such goods and/or merchandise are at a warehouse and/or storage and/or processing facility. Subject to a deductible of $25,000 per occurrence. This extension of coverage shall not attach for more than:

| Division | Address | City | State | Country | Zip | Limit |
|----------|---------|------|-------|---------|-----|-------|
| Electric | 641 Massman Dr. | Nashville | TN | USA | 37210 | $10,000,000 |
| Electric | 643 Massman Dr. | Nashville | TN | USA | 37210 | $5,000,000 |

20. The MSI Binder states, in relevant part, as follows:

> Effective: January 1, 2010 policy open and continuous until cancelled by either party giving Ninety (60) (sic) days notice.
>
> Assured: Gibson Guitar Corporation
>
> Limits of Liability: $15,000,000 in excess of $10,000,000 any one location, any one occurrence. (Stock only)
>
> Locations:
> - Baldwin Piano Plant, 900 Hwy,. #463 S.

- 5 -

Trumann, AR 72472-9604
- Electric, 641 Massman Dr., Nashville, TN 37210
- Baldwin Dongbei, Bohai Street, Yinkou, Liaoning, China
- Deutsche Wurlitzer, Wurlitzer 6, Hullhorst, Germany

Terms & Conditions: Subject to all other terms, clauses and conditions as per underlying policy, including amendments thereto or without notice and to follow absolutely all settlement. Such settlements being binding on all participating underwriters hereon.

*Note: This binder is intended as a summary and should only be utilized as a representation of this policy's general terms and conditions. The actual policy must be referred to for a proper and thorough determination of its provisions and for any coverage analysis.*

### Treatment of the Insured Location

21.     That portion of the Massman Drive Facility denominated as 641 Massman is an approximately 110,000 square foot manufacturing facility where Gibson manufactures and assembles its world-famous "Les Paul" branded Gibson electric guitars.

22.     That portion of the Massman Drive Facility denominated as 643 Massman is physically connected to 641 Massman, and is an approximately 30,000 square foot finished goods storage area used to store finished stock (i.e., Gibson branded guitars) produced by the Electric Division.

23.     By the time Gibson's Marine Insurance Program incepted in or about 2003, Gibson was relying on Willis, including Willis' Marine Division, as the representative of the insurers.

24.     Since at least 2003 and continuing to the present, Willis has been provided with extensive knowledge about Gibson's worldwide business operations, its physical locations, and

- 6 -

the values Gibson attaches to its finished goods, equipment, gear, work in progress, and raw materials, all for the purpose of tailoring Gibson's insurance portfolio to its unique needs.

25.     At each successive renewal of the Marine Insurance Program, Gibson has provided Willis with a single combined inventory value for the Massman Drive Facility to be used for determining the appropriate coverage.

26.     By way of example, in 2009, Gibson prepared a Statement of Stock Values for delivery to Willis in connection with the upcoming renewal of its Marine Insurance Program. In recognition that the Massman Drive Facility has been long regarded as a single location bearing two separate addresses, Gibson's "Statement of Stock Values" informed Willis that Gibson assigned a combined stock/inventory value of $14,412,663 to 641 Massman, and $0 to 643 Massman.

27.     Willis has also been aware since at least 2003 that the value of the work in progress, gear and raw materials in the manufacturing portion of the Massman Drive Facility denominated as 641 Massman never exceeded $10 million. For obvious reasons of which Willis was also aware, the majority of the "value" was in the storage portion of the facility, denominated as 643 Massman, which contained the finished goods (i.e., Gibson-branded electric guitars) to be shipped to retail outlets for sale.

28.     Since at least 2004, Willis has provided both CNA and MSI (and other of Gibson's insurers) with a wealth of information about Gibson's stock and inventory values, insurance requirements and physical locations, including detailed information describing the operations and physical plant characteristics of the Massman Drive Facility. These insurers underwrote Gibson's Marine Insurance Program on the basis of the extensive documentation and knowledge furnished to Willis by Gibson, supplemented by routine oral communications and

directives from Willis, and direct communications between the insurers and Gibson.

29.     Upon information and belief, commencing with the 2009 renewal, CNA made an internal business decision to limit its catastrophic exposure.  To implement this change, CNA proposed to reduce its exposure at any single insured location under Gibson's Marine Insurance Program to $10 million.

30.     Gibson was not made aware of these changes, or alerted to them by Willis.

31.     In tandem with this business decision, CNA modified its Warehouse Endorsement form to limit coverage on any single "location" to $10 million, and to assign a "default value" of $5 million in limits to each insured location that was assigned a value by Gibson of less than $5 million.

32.     CNA failed to apprise Willis or Gibson that this modification would apply across-the-board to all Gibson locations, including at "zero-value" locations such as 643 Massman.

33.     Gibson was not made aware of these changes, or alerted to them by Willis.

34.     Due to miscommunications and/or errors by Willis and CNA, and contrary to Gibson's express intentions and expectations, CNA inexplicably described 641 Massman and 643 Massman as separate "line item" locations in the Warehouse Endorsement.

35.     Underwriting information including, but not limited to, Gibson's Statement of Stock Values, which was in Willis, CNA and MSI's possession, indisputably showed that Gibson intended to obtain insurance for all of its stock, with a value of over $14 million, and to treat the Massman Drive Facility as a single unit.

36.     Despite the unambiguous underwriting information, CNA attempted to arbitrarily assign a value of $5 million to the stock in the 643 Massman area of the facility, which would leave that "location" widowed from 641 Massman.

- 8 -

37.     Notwithstanding this scrivener's error and the resulting unintended modification to Gibson's Marine Insurance Program, CNA continued to calculate Gibson's premium at 641-643 Massman based upon a single combined insured stock value of $14.4 million. Gibson continued to pay the premium.

38.     At the time MSI underwrote Gibson's excess stock insurance above CNA's $10 million limits, MSI was in possession of Gibson's Statement of Stock Values from which it had actual or constructive knowledge that Gibson treated the Massman Drive Facility as a single "location" with a combined $14.4 million stock value.

39.     Nevertheless, MSI mischaracterized the Massman Drive Facility as consisting of two separate locations.

40.     Owing to this misunderstanding and/or errors made by Willis, CNA and MSI, effective January 1, 2010, MSI issued the ambiguous MSI Binder referencing "Electric, 641 Massman Dr., Nashville, TN 37210" as an insured location. If there was no nefarious intent on behalf of Willis, CNA, or MSI, this was clear scrivener's error because it was well known that the Massman Drive Facility is comprised of the entire facility, bearing the 641 and 643 Massman addresses, not just 641 Massman. If the MSI coverage were to apply to the 641 Massman portion, any coverage MSI purported to offer was illusory inasmuch as MSI had actual or constructive knowledge from Willis, CNA and/or MSI's underwriting files that the manufacturing portion of the Massman Drive Facility, at 641 Massman, never contained stock, raw materials or work in progress worth in excess of $10 million. Under that scenario, Gibson would not have required excess stock insurance for losses over $10 million at that portion of the Massman Drive Facility.

- 9 -

## The Insured Peril and Scope of the Loss

41.    On or about May 1-2, 2010, Nashville experienced two consecutive days of torrential rains.  During this two-day period, more than thirteen inches of rain fell in and around Nashville, doubling the previous 6.6 inch record Nashville two-day rainfall total on September 21, 1979.

42.    As a result of the unprecedented rain event, cresting floodwaters from swollen creeks and rivers inundated thousands of homes and business, including the Massman Drive Facility.

43.    As a result of water damage and intrusion, Gibson suffered a total loss of the Massman Drive Facility's contents, amounting to approximately $17 million.  According to CNA's adjusters, the loss is apportioned as follows: $6,300,000 at 641 Massman, and $11,020,000 at 643 Massman.

## CNA's Treatment of the Claim

44.    Gibson timely notified Willis of the loss.  Willis then transmitted a notice of loss to CNA on or about May 10, 2010, and subsequently prepared a proof of loss documenting the gear, work in progress, finished inventory and raw materials that were exposed to the floodwaters and adjudged by the insured to be unfit for use or sale.

45.    On June 8, 2010, Willis advised CNA under the "Errors and Omissions" clause in the Policy that an error had been made because of which Willis and/or CNA had unintentionally underreported Gibson's insured contents.  The notice further advised MSI that the insured had always intended (and paid premium for) combined treatment of the Massman Drive Facility as a single insured location such that losses above $10 million would fall within MSI's excess layer.

46.    Without prejudice to Gibson's rights, CNA has adjusted and begun paying the

- 10 -

claim as though the Warehouse Endorsement referred to the Massman Drive Facility as a single combined location with contents exceeding CNA's $10 million limits.

47.     On or about July 12, 2010, CNA informed MSI that it views the primary insured limits as exhausted as a result of its intent to pay $10 million (less the self-insured retention) to its insured, Gibson.

48.     CNA has made a settlement offer to Gibson, consistent with the settlement provisions of the MSI Binder, to treat the Massman Drive Facility as a single combined location and loss with an insured limit of $10 million.  If accepted by Gibson, this would result in exhaustion of CNA's primary insurance.

### MSI's Treatment of the Claim

49.     On June 8, 2010, Willis advised MSI under the "Errors and Omissions" clause in the Policy that an error had been made because of which Willis and/or CNA and/or MSI had unintentionally underreported Gibson's insured contents.  The notice further advised MSI that the insured had always intended (and paid premium for) combined treatment of the Massman Drive Facility as a single insured location such that losses above $10 million would fall within MSI's excess layer.

50.     On or about July 12, 2010, Willis advised MSI that CNA viewed its $10 million insured layer as exhausted, triggering MSI's obligation to adjust and pay Gibson's loss.

51.     MSI failed entirely to respond until more than four months had elapsed from the notice of loss.  On September 30, 2010, Gibson received correspondence from counsel engaged by Mitsui alleging that MSI was "continuing its investigation into this claim."  This was the first response from, or on behalf of, Mitsui responding to the notice of loss.

52.     Thereafter, Mitsui hired the same adjuster CNA had previously engaged in its

- 11 -

claims process. Mitsui failed to investigate the claim and failed to provide the insured with instructions as to whether it would authorize the destruction of any contents at the Massman Drive Facility, thereby waiving its inspection right and binding itself to the aggregate loss estimate of approximately $17 million, as determined by CNA.

53.     Despite never issuing the policy contemplated by the MSI Binder, MSI has refused to follow the proposed settlement, as required by the language of the MSI Binder: "Subject to all other terms, clauses and conditions as per underlying policy, including amendments thereto or without notice and to follow absolutely all settlement. Such settlement being binding on all participating underwriters hereon."

54.     Acting in bad faith, MSI has clung to the ambiguous and faulty language of the MSI Binder, literally interpreting the MSI Binder to provide excess coverage for an over-insured location and thereby denying the insured's intention and desire to obtain excess coverage.

55.     Acting in bad faith, MSI representatives and its attorneys travelled to Nashville and attempted to depose Gibson employees and representatives about Gibson's losses and the physical characteristics of the Massman Drive Facility in order to obtain evidence from which it could deny the claim and deny Gibson the benefit of its bargain.

56.     Acting in bad faith, MSI instructed its adjuster to ignore any losses at 643 Massman and forego inspection of that "location," resulting in an unfair and repugnant demonstration masquerading as proper claims handling.

**Gibson is Entitled to Payment of its Loss Under the Policy.**

57.     The water damage and inundation to the finished goods, gear, work in progress and raw materials amount to a covered $17 million loss under the CNA Policy and fall plainly within the all risk coverage afforded by the CNA Policy, the extension of coverage under the

- 12 -

Warehouse Endorsement, and the MSI Binder.

58.     Gibson has fulfilled all of its obligations and satisfied all conditions precedent under the CNA Policy and MSI Binder.

59.     No exclusions or unfulfilled conditions exist to bar coverage for Gibson's claim.

### Count I – Breach of Contract or Coverage by Estoppel
### (Against MSI and CNA)

60.     Gibson incorporates by reference each of the allegations set forth in paragraphs 1 through 59 above as if expressly set forth herein.

61.     Gibson asked Willis to procure insurance coverage of at least $25 million for the Massman Drive Facility.  Willis did so, and Gibson paid the appropriate premiums for the Policies.

62.     Gibson has fulfilled all of its obligations and satisfied all conditions precedent under the Policies.

63.     No exclusions or unfulfilled conditions exist to bar coverage for Gibson's claim.

64.     The damage caused by the flooding amounts to at least a $17 million loss, including without limitation inventory and gear related to its instruments and brand, such as accessories and apparel, and falls plainly within the coverage afforded by the Policies.

65.     Further, or in the alternative, Willis was representing CNA and/or MSI when procuring the coverage requested by Gibson.    Gibson reasonably relied on Willis' representations that CNA and MSI had provided $25 million of coverage for the Massman Drive Facility, and Gibson paid the appropriate premiums. CNA and MSI are estopped to deny that the loss is covered in its entirety.

66.     MSI and CNA each breached their respective insurance contract with Gibson by failing to pay the entire loss.

- 13 -

67. As a proximate result of the breaches of contract by CNA and MSI, Gibson has been damaged in an amount to be proven at trial.

### Count II – Declaratory Relief
### (Against CNA and MSI)

68. Gibson incorporates by reference each of the allegations set forth in paragraphs 1 through 67 above as if expressly set forth herein.

69. CNA has proposed to settle Gibson's claim, consistent with the MSI Binder, to amend the CNA Policy and to treat the loss at the Massman Drive Facility as a combined $10 million loss at a single location and pay its limits, triggering MSI's obligation to provide excess insurance.

70. Under the MSI Binder, MSI is subject to all terms and conditions "as per underlying policy," is obliged to "follow absolutely all settlement" by CNA, and must accept any amendments to the CNA Policy without notice. Under the MSI Binder, a settlement by CNA is "binding on all participating underwriters hereon," including MSI.

71. Accordingly, Gibson requests that the Court enter an Order ratifying the proposed settlement between CNA and Gibson, authorizing Gibson to accept the settlement, and effectuating the language of the MSI Binder, which obliges MSI to follow the settlement, amend the MSI Binder without notice with respect to the covered location at the Massman Drive Facility, and pay Gibson its losses up to the MSI Binder's $15 million limits.

72. An actual and justiciable controversy exists between Gibson, CNA and MSI.

### Count III – Declaratory Relief
### (Against CNA and MSI)

73. Gibson incorporates by reference each of the allegations set forth in paragraphs 1 through 72 above as if expressly set forth herein.

- 14 -

74. Under the terms of the CNA Policy and MSI Binder, CNA and MSI must accept, acknowledge and act promptly upon a properly reported "Error or Omission" in connection with the undervaluation of the insured contents of the Massman Drive Facility as a single combined location with a contents value of at least $14.4 million.

75. Willis timely and promptly transmitted notice of the error on June 8, 2010.

76. By operation of Tennessee law, Willis represented CNA and/or MSI when placing, ordering and binding Gibson's Marine Insurance Program. Willis' knowledge of Gibson's expectation and understanding that the Massman Drive Facility would be treated as a combined single location with at least $14.4 million in contents is imputed to CNA and/or MSI.

77. Based upon the insurers' actual and/or constructive knowledge concerning the Massman Drive Facility, Gibson requests that the Court enter an Order declaring that CNA and MSI are estopped from denying that Gibson is entitled to coverage under the CNA Policy and MSI Binder.

78. An actual and justiciable controversy exists between Gibson, CNA and MSI.

## Count IV – Declaratory Relief
### (Against MSI)

79. Gibson incorporates by reference each of the allegations set forth in paragraphs 1 through 78 above as if expressly set forth herein.

80. The MSI Binder is ambiguous in that it refers to the insured location as "Electric 641 Massman Dr. Nashville, TN 37210." This location is indeed a reference to the Electric Division of Gibson, but this location also encompasses that portion of the Massman Drive Facility which is connected to and forms a part of 641 Massman but is denominated as 643 Massman Drive for convenience purposes.

- 15 -

81.     Due to the $17 million in loss Gibson has presented, as adjusted, CNA's insured limits have been exhausted and MSI's excess layer is triggered and must respond.

82.     But for MSI's misinterpretation and/or strained view of the ambiguous terms and conditions of the MSI Binder, it would be required to pay Gibson's losses.

83.     An actual and justiciable controversy exists between Gibson and MSI.

84.     This Court should order and decree that the insured location reference is ambiguous, must be construed in Gibson's favor, and is in fact a reference to the Massman Drive Facility.

## Count V – Alternative Count for Declaratory Relief
### (CNA)

85.     Gibson incorporates by reference each of the allegations set forth in paragraphs 1 through 84 above as if expressly set forth herein.

86.     The CNA Policy and/or Warehouse Endorsement is ambiguous in that a schedule included thereon refers to separate buildings at 641 Massman Drive and 643 Massman Drive, ascribing a total amount of coverage of $15 million with separate insured limits. This $15 million limit is apportioned in an ambiguous manner because these "locations" are actually a single building. Thus, a total unapportioned insured limit of $15 million at the Massman Drive Facility should be available to Gibson, construing this ambiguity in its favor.

87.     CNA itself had actual or constructive knowledge that the Massman Drive Facility was a single insured location with at least $14.4 million in contents in gear, finished goods and raw materials.

88.     Further, CNA had knowledge that the Massman Drive Facility was a single insured location with at least $14.4 million in contents through Willis, which was the insurance producer and which placed and ordered insurance as a representative of CNA. Willis understood

- 16 -

from Gibson that the Massman Drive Facility should be treated as a combined single location with at least $14.4 million in contents, yet CNA provided Gibson an ambiguous policy in this regard.

89.     Based on Willis' error, Gibson requests that the Court enter an Order declaring that CNA is estopped from asserting that the CNA Policy does not respond to the loss in the sum of $15 million.

90.     An actual and justiciable controversy exists between Gibson and CNA regarding their respective duties and obligations under the Policy.

91.     If the MSI Binder does not respond to this loss, CNA is obliged to provide up to $15 million in primary coverage under the terms and conditions of the CNA Policy and this Court should order and decree CNA to pay Gibson $15 million because CNA's reference to 641-643 Massman as two buildings is ambiguous.

### Count VI – Alternative Count for Reformation
### (Mistake in Expression – against CNA)

92.     Gibson incorporates by reference each of the allegations set forth in paragraphs 1 through 91 above as if expressly set forth herein.

93.     In the alternative, if, as written the CNA Policy and the MSI Binder do not express the parties' intentions and expectations that Gibson would have $25 millions of coverage for the entire Massman Drive Facility, then the CNA Policy contains a mistake in expression.

94.     Specifically, as noted above, CNA, Willis and Gibson mutually understood and agreed that 641-643 Massman Drive was a single insured location with at least $14.4 million in stock, gear, finished goods and raw materials.

95.     CNA, Willis and Gibson intended this understanding and agreement about the combined insured location and contents value to be expressed in the CNA Policy.

- 17 -

96.     The CNA Policy differs from the understanding of CNA, Willis and Gibson in this regard.

97.     The variation between the CNA Policy and the agreement and understanding between CNA, Willis and Gibson about the combined insured location and contents value to have been expressed in the CNA Policy is not the result of gross negligence on the part of Gibson.

98.     Due to this mistake in expression, the CNA Policy should be reformed to reflect the understanding that the Massman Drive Facility was a single insured location with at least $14.4 million in stock, gear, finished goods and raw materials.

### Count VII – Alternative Count for Reformation
### (Mutual Mistake/Scrivener's Error – against CNA)

99.     Gibson incorporates by reference each of the allegations set forth in paragraphs 1 through 98 above as if expressly set forth herein.

100.    In the alternative, if, as written, the CNA Policy and the MSI Binder do not express the parties' intentions and expectations that Gibson would have $25 millions of coverage for the entire Massman Drive Facility, then the CNA Policy is the result of a mutual mistake in that CNA, Willis and Gibson intended that 641-643 Massman Drive be treated as a single insured location with at least $14.4 million in stock, gear, finished goods and raw materials.

101.    CNA, Willis and Gibson intended this understanding and agreement about the combined insured location and contents value to be expressed in the CNA Policy.

102.    Due to scrivener's error on the part of CNA and/or Willis, the CNA Policy differs from the understanding of CNA, Willis and Gibson in this regard.

103.    Due to mutual mistake, the CNA Policy should be reformed to reflect the understanding that the Massman Drive Facility was a single insured location with at least $14.4

- 18 -

million in stock, gear, finished goods and raw materials.

## Count VIII – Alternative Count for Reformation
### (Mistake in Expression – against MSI)

104.    Gibson incorporates by reference each of the allegations set forth in paragraphs 1 through 103 above as if expressly set forth herein.

105.    In the alternative, if, as written, the language of the MSI Binder does not express the parties' intentions and expectations that Gibson would have $25 millions of coverage for the entire Massman Drive Facility, then the MSI Binder contains a mistake and does not correctly express the intentions and expectations of the parties.

106.    MSI, CNA, Willis and Gibson mutually understood and agreed that the Massman Drive Facility was a single insured location with at least $14.4 million in stock, gear, finished goods and raw materials.

107.    MSI, CNA, Willis and Gibson intended this understanding and agreement about the combined insured location and contents value to be expressed in the MSI Binder.

108.    The MSI Binder differs from the understanding of MSI, Willis and Gibson in this regard.

109.    The variation between the MSI Binder and the agreement and understanding between MSI, Willis and Gibson about the combined insured location and contents value to have been expressed in the MSI Binder is not the result of gross negligence on the part of Gibson.

110.    Due to this mistake in expression, the MSI Binder should be reformed to reflect the understanding that the insured location is "Electric 641-643 Massman Drive, Nashville Tennessee" and that MSI's insurance attaches at that location in excess of the $10 million CNA limits.

- 19 -

### Count IX – Alternative Count for Reformation
### (Mutual Mistake/Scrivener's Error – against MSI)

111.   Gibson incorporates by reference each of the allegations set forth in paragraphs 1 through 110 above as if expressly set forth herein.

112.   In the alternative, if, as written, the language of the MSI Binder does not express the parties' intentions and expectations that Gibson would have $25 millions of coverage for the entire Massman Drive Facility, then the MSI Binder is the result of a mutual mistake in that MSI, Willis and Gibson intended and agreed that the Massman Drive Facility was a single insured location with at least $14.4 million in contents in gear, finished goods and raw materials.

113.   MSI, Willis and Gibson intended this understanding and agreement about the combined insured location and contents value to be expressed in the MSI Binder.

114.   Due to scrivener's error on the part of MSI and/or Willis, the MSI Binder differs from the understanding of MSI, Willis and Gibson in this regard.

115.   Due to mutual mistake, the MSI Binder should be reformed to reflect the understanding that the insured location is "Electric 641-643 Massman Drive, Nashville Tennessee" and that MSI's insurance attaches at that location in excess of the $10 million CNA limits.

### Count X – Bad Faith Failure to Pay Insurance Loss
### (Tenn. Code Ann. § 56-7-105 – Against MSI)

116.   Gibson incorporates by reference each of the allegations set forth in paragraphs 1 through 115 above as if expressly set forth herein.

117.   The damage to the property amounts to a covered loss of at least $17 million under the Policies and falls plainly within the coverage afforded by the Policies.

118.   Gibson and MSI entered into a contract of excess insurance in the form of the MSI Binder. Gibson asked Willis to procure insurance coverage for at least $25 million at the

- 20 -

Massman Drive Facility, including $15 million of excess coverage from MSI. Willis represented that it did so, and Gibson reasonably relied on that representation. Willis was at all times the agent of MSI. MSI is estopped to deny that the loss is covered in its entirety.

119.    MSI refused to pay the loss within sixty (60) days after a demand was made. MSI's refusal to pay the loss was not in good faith as MSI engaged in a pattern of bad-faith conduct in an attempt to defeat Gibson's rights under the Policies, including, without limitation by: (1) refusing to pay the loss despite actual or constructive knowledge that the loss was covered by its policy with Gibson, (2) sending MSI representatives and its attorneys to Nashville and attempting to depose the insured about its losses and the physical characteristics of the building as a pretext to obtain evidence from which it could deny the claim and deny the insured the benefit of its bargain, and (3) instructing its adjuster not to inspect Gibson's warehouse at that location.

120.    MSI's bad-faith failure to pay caused Gibson to incur additional expense, loss or injury including attorney fees. For MSI's bad faith conduct, Gibson is entitled to compensatory damages and, in addition to the loss and any applicable interest, a sum of twenty-five percent on the liability for the loss.

## Count XI – Bad Faith Failure to Pay Insurance Loss
### (Tenn. Code Ann. § 56-7-105 – Against MSI)

121.    Gibson incorporates by reference each of the allegations set forth in paragraphs 1 through 120 above as if expressly set forth herein.

122.    Gibson lost gear related to its instruments and brand, such as accessories and apparel, during the flood.

123.    The gear constitutes goods and/or merchandise and/or property within the meaning of the Policies.

- 21 -

124.    MSI refused to pay for the loss of such gear within sixty (60) days after a demand was made.  The refusal of MSI to pay the loss was not in good faith as MSI knew or should have known that the loss was covered by the MSI Binder and MSI further engaged in a pattern of bad-faith conduct in an attempt to defeat Gibson's rights under the MSI Binder, including as specified above.

125.    The bad-faith failure of MSI to pay caused Gibson to incur additional expense, loss or injury, including attorney fees.  For the bad faith conduct of MSI, Gibson is entitled to compensatory damages and, in addition to the loss and any applicable interest, a sum of twenty-five percent on the liability for the loss.

### Count XII – Tennessee Consumer Protection Act
### (Tenn. Code Ann. § 47-18-101 et seq. – Against MSI)

126.    Gibson incorporates by reference each of the allegations set forth in paragraphs 1 through 125 above as if expressly set forth herein.

127.    Gibson is a consumer and paid premiums for the insurance policies with CNA and MSI.  In the policies, CNA and MSI agreed to pay the damages that Gibson sustained from the loss at the Massman Drive Facility caused by the flood.

128.    MSI and CNA had actual and constructive knowledge that the excess insurance covered the entire Massman Drive Facility and that Gibson was paying the appropriate premiums for such coverage, yet now MSI denies coverage despite accepting the premiums.

129.    MSI and CNA engaged in unfair and deceptive acts under the Tennessee Consumer Protection Act ("TCPA"), including, without limitation, engaging in any other act or practice which is unfair or deceptive to the consumer or to any other person.  MSI and CNA violated the TCPA through their conduct, including by failing to pay in full Gibson's loss despite accepting premiums for such insurance coverage.  MSI and CNA have further refused to pay for

- 22 -

the loss of Gibson gear related to its instruments and other branded goods, as noted above.

130.   The violation of the TCPA by MSI and CNA has been willful and knowing. Gibson suffered a loss of money, property or thing of value as a result of the unfair or deceptive act or practice.  Gibson seeks all available remedies under the TCPA, including compensatory damages, treble damages and recovery of its reasonable attorneys' fees and costs.

### Count XIII – Alternative Count for Failure to Procure Insurance
#### (Against Willis)

131.   Gibson incorporates by reference each of the allegations set forth in paragraphs 1 through 130 above as if expressly set forth herein.

132. .  Gibson and Willis entered an undertaking or agreement for Willis to procure at least $25 million of insurance coverage for the Massman Drive Facility location from CNA and MSI.

133.   The actions and representations of Willis warranted Gibson's assumption that Gibson was properly insured for said coverage.

134.   In the alternative and should it be determined that the language of the CNA and MSI Policies is not written in such a way to make it plain that Gibson's entire loss is covered (and Gibson asserts that the CNA Policy and MSI Binder do cover in full its loss), Willis breached its agreement to procure $25 million of insurance coverage for the Massman Drive Facility location, failed to use reasonable diligence in attempting to procure such insurance, and failed to notify Gibson promptly of any such failure.

135.   Any such failure has damaged Gibson in an amount to be proven at trial.

### Count XIV – Alternative Count for Attorneys' Fees and Expenses
#### (Against Willis)

136.   Gibson incorporates by reference each of the allegations set forth in paragraphs 1 through 135 above as if expressly set forth herein.

- 23 -

137. In the alternative and should it be determined that the language of the CNA Policy and MSI Binder is not written in such a way to make it plain that Gibson's entire loss is covered (and Gibson asserts that the CNA Policy and MSI Binder do cover in full its loss), because of any failure to procure insurance by Willis, Gibson has been required to act in the protection of its interests by bringing or defending an action against CNA and MSI and incurring other costs, including attorneys' fees, in connection therewith.

138. As a result of any such failure by Willis, Gibson is entitled to recover from Willis reasonable compensation for loss of time, attorneys' fees and other expenditures suffered or incurred in this action against MSI and CNA and related matters, including the case styled <u>Mitsui Sumitomo Insurance USA Inc. v. Gibson Guitar Corporation et al.</u>, No. 1:11-cv-00295-LLC (S.D.N.Y.).

<u>Prayer For Relief</u>

**WHEREFORE**, Plaintiff, Gibson Guitar Corp., prays this Court for the following relief:

1. Actual and compensatory damages in an amount to be determined at trial;

2. Declaratory relief as set forth above;

3. In addition to the loss and any applicable interest, a sum of twenty-five percent on the liability for the loss under Tenn. Code Ann. § 56-7-105;

4. Treble damages;

5. An award of attorneys' fees and expenses;

6. In the alternative, reformation of the Policies to cover in full Gibson's loss;

7. Pre-judgment interest on the amount awarded; and

8. Such other and general relief as the Court deems just and proper.

- 24 -

**<u>Jury Demand</u>**

Gibson demands a trial by jury on all issues so triable.

Respectfully submitted,

Dated: March 23, 2011          By:  _____

Steven A. Riley (BPR# 6258)
Timothy G. Harvey (BPR# 021509)
Riley Warnock & Jacobson, PLC
1906 West End Avenue
Nashville, Tennessee 37203
(615) 320-3700
sriley@rwjplc.com
tharvey@rwjplc.com

*Attorneys for Gibson Guitar Corp.*

Of Counsel:
Peter M. Gillon
Geoffrey J. Greeves
James P. Bobotek
Pillsbury Winthrop Shaw Pittman LLP
2300 N Street, NW
Washington, D.C. 20037-1122
Tel.: (202) 663-8000
Fax: (202) 663-8007
E-mail: peter.gillon@pillsburylaw.com
        geoffrey.greeves@pillsburylaw.com
        james.bobotek@pillsburylaw.com

*Attorneys for Gibson Guitar Corp.*

## *MARINE OPEN CARGO POLICY*

### *NO. OC 24-4422*

### *OF THE CONTINENTAL INSURANCE COMPANY*

(Hereinafter referred to as "This Assurer")

In consideration of premium paid or payable, as agreed, does insure:

1. **THE ASSURED:**

   Gibson Guitar Corporation
   645 Massman Drive
   Nashville, TN 37210

   and its subsidiary, associated, affiliated and interrelated companies, and joint ventures in which it now has or hereafter may have a direct interest and other entities for whom they may have instructions to insure or deem themselves responsible to insure, as their respective interests may appear (hereinafter referred to as "The Assured").

2. **LOSS PAYEE:**

   Losses payable to The Assured or order.

3. **COVERING ON:**

   Goods and/or merchandise and/or property of every description incidental to The Assured's business consisting principally of, but not limited to musical instruments, raw materials and similar products and including prepaid freight and/or advanced freight and/or guaranteed freight "vessel lost or not lost" (Under and/or On Deck) shipped by or to the The Assured or by or to others for The Assured's account or control or in which The Assured may have an interest; also to cover shipments of goods and/or merchandise and/or property for the account of others on which The Assured agrees or receives instructions to insure.

4. **ATTACHMENT AND CANCELLATION:**

   This policy to be deemed continuous and covers all shipments of goods and/or merchandise and/or property made on and after January 1, 2004 and on all goods and/or merchandise and/or property at risk at storage locations insured hereunder on and after said date but subject to cancellation by either party on 60 days written notice, such cancellation, however, is not to prejudice any risks which had


EXHIBIT
A
tabbies

attached prior to the effective date of such notice except that any coverage on goods and/or merchandise and/or property at risk at storage locations insured hereunder shall terminate on said date.

It is agreed that, if in the event this Assurers' A.M. Bests' rating drops below the Assured's "acceptable security level", the Assured may elect to cancel coverage immediately upon written notice to this Assurer.

### 5. CONVEYANCES:

Per steamer and/or steamers and/or motor vessels and/or barges and/or land or air conveyances and all connecting conveyances including shipments by mail and/or parcel post, messengers and couriers.

NOTE: Wherever the words "ship", "vessel", "seaworthiness", "shipowner" or "vessel owner" appear in this policy, they are deemed to include also the words "aircraft", "airworthiness", and "aircraft owner".

### 6. GEOGRAPHICAL LIMITS:

This insurance attaches from the time the subject matter becomes at the Assured's risk or the Assured assumes interest or the Assured is obligated to insure and continues while held as stock and / or at the and / or at the Assured's storage location(s) and / or Consolidation / Deconsolidation points and / or undergoing Processing, Assembly, Renovation and Repair whether or not in the course of transit and until the Assured's interest ceases or the Assured is no longer obligated to insure. To include inland transit and inventory storage.

### 7. PREMIUM:

The consideration for all of the coverages provided in this policy, including contingent and extended coverages, unless otherwise agreed, is the premium payable for the primary coverage, as agreed.

### 8. VALUATION:

Unless specifically provided for elsewhere in this policy, or instructions to the contrary are given or received by the Assured, the goods and/or merchandise and/or property insured under this policy shall be valued at:

Finished goods and/or merchandise and/or property insured under this policy while in transit shall be valued at the Assured's selling price.

Unfinished goods and/or merchandise and/or property in storage/processing shall be valued at CIF plus 10%.

Case 3:11-cv-00370   Document 1-1   Filed 04/19/11   Page 30 of 102 PageID #: 39

On sold property, but not delivered, goods will be valued at the Assured's selling price. If there is no invoice, the goods will be valued at actual cash market value at and place time of loss

Privilege is granted to The Assured to insure in foreign currencies. When the privilege is exercised, the proceeds paid under this policy are payable in the same currencies, otherwise the proceeds are payable in United States dollars at the rate of exchange current on the date the above invoice was issued as published in the Dow Jones Foreign Exchange Rates.

Insured goods and/ or merchandise and/or property shipped free of charge, or for an amount not reflective of their actual value, to or from The Assured shall be valued at replacement cost new, whether or not actually replaced.

Used goods and/ or merchandise and/or property shall be valued at replacement value with like kind and quality. If unable to be replaced with like kind and quality then at actual cash value.

In the event The Assured receives written instructions for goods and/or merchandise and/or property to be valued on a basis differing from the above, then the goods and/or merchandise and/or property are to be valued in accordance with such instructions.

9. **LIMITS OF LIABILITY:**

Unless otherwise agreed This Assurer shall not be liable under this policy for more than:

| | |
|---|---|
| $ 2,000,000 | per any one conveyance, connecting conveyance, craft or at any place at any time, except; |
| $ 500,000 | per any one vessel, subject to an "On Deck" bill of lading |
| $ 500,000 | per any one exhibition; |
| $ 50,000 | per any one package via parcel post, messenger or courier |

If the total value at risk exceeds the limit of liability provided by this policy, The Assured shall nevertheless report the full amount at risk to This Assurer and shall pay full premium thereon, in consideration of which the principle of co-insurance is waived by This Assurer. Acceptance of such reports and premium by the company shall not alter or increase the limit of liability of This Assurer but This Assurer shall be liable for the full amount of covered loss up to but not exceeding the applicable limit of liability.

This Assurer shall pay in full claims for general average, salvage and special charges and for such expenses as are provided for in the Sue and Labor clause even though the sum insured may be less than the contributing value or actual value of the goods and/or merchandise and/or property insured under this policy.

10. **ACCUMULATION CLAUSE:**

Should there be an accumulation of the interests insured hereunder beyond the limit(s) of liability expressed elsewhere in this policy by reason of any interruption of transit or circumstance beyond the control of The Assured's corporate risk manager or equivalent, or by reason of any casualty, or at a transshipping point, or on a connecting conveyance, This Assurer shall, provided notice of such accumulation is given to This Assurer as soon as practicable after it becomes known to The Assured's corporate risk manager or equivalent, hold covered such excess interest and shall be liable for the full amount at risk, but in no event shall This Assurer's liability exceed twice the limit of liability set forth in Clause 9.

11. **CONDITIONS OF COVERAGE:**

Unless otherwise specified below, all goods and/or merchandise and/or property are insured:

(A)     Against all risks of physical loss or damage from any external cause whatsoever, except those risks that may be excluded by the F.C. & S. warranty S.R. and C.C. warranty and/or other warranties or exclusions specified in this policy, unless covered elsewhere herein, irrespective of percentage.

(B)     While "On Deck" of an ocean vessel and subject to the terms of an "On Deck" Bill of Lading, unless otherwise agreed:

Free of particular average unless the vessel and/or craft be stranded, sunk, burnt, on fire or in collision with another ship or vessel, or loss of and/or damage to the interest hereby insured which may reasonably be attributed to fire or contact (other than collision with another ship or vessel) of the vessel and/or craft with any substance, ice included, other than water, but including jettison and/or washing and/or loss overboard, irrespective of percentage.

(C)     Goods and/or merchandise shipped "On Deck" without the knowledge and consent of The Assured and subject to the terms and conditions of an "Under Deck" Bill of Lading shall be insured subject to the conditions of coverage reflected in clause 11 (A) above and rates and limits of liability as set forth in this policy.

Goods and/or merchandise shipped in containers and/or vans and/or lighters aboard ships shall be insured subject to the conditions of coverage

Case 3:11-cv-00370   Document 1-1   Filed 04/19/11   Page 32 of 102 PageID #: 41

reflected in clause 11 (A) above and rates and limit of liability as set forth in this policy, whether stowed under and/or on deck.

## 12. DEDUCTIBLE:

A deductible of $1,000 shall apply to any one conveyance. However, this deductible shall not apply to (i) survey fees, (ii) general average, salvage or special charges, (iii) loss, damage or expense arising from any FPA Perils, Shore Perils, Inchmaree Perils or Explosion Peril, as defined elsewhere in this policy, (iv) loss, damage or expense covered under the Sue and Labor, Total Loss or Debris Removal clauses or the S.R. & C.C. Endorsement.

The deductible shall not be applied so as to reduce This Assurer's obligation to pay the full amount of any limit(s) of liability set forth in this policy.

## 13. PERILS CLAUSE:

Touching the adventures and perils which This Assurer is contented to bear, and takes upon itself, in this voyage, they are of the seas, fires, jettisons, assailing thieves, barratry of the Master and Mariners, and all other like perils, losses and misfortunes that have or shall come to the hurt, detriment or damage of the said goods and/or merchandise and/or property, or any part thereof except as may be otherwise provided for herein or endorsed hereon.

## 14. WAREHOUSE TO WAREHOUSE:

This insurance attaches from the time the goods and/or merchandise and/or property leaves the warehouse and/or store or other location at the place named in the policy, special policy, certificate or declaration for the commencement of the transit and continues during the ordinary course of transit until the goods and/or merchandise and/or property are delivered to final warehouse store or other location at the destination named in the policy, special policy, certificate or declaration or until the expiry of 15 days or (30 days if the destination to which the goods and/or merchandise and/or property are insured is outside the limits of the port) whichever shall first occur. The time limits referred to above to be reckoned from midnight of the day on which the discharge over the side, of the goods and/or merchandise and/or property hereby insured from the overseas vessel is completed. Held covered at a premium to be arranged in the event of transshipment, if any, other than as above and/or in the event of delay in excess of the above time limits arising from circumstances beyond the control of The Assured.

*NOTE: It is necessary for The Assured to give prompt notice to This Assurer when the Risk Manager or equivalent become aware of an event for which they are "held covered" under this policy and the right to such cover is dependent on compliance with this obligation.*

Case 3:11-cv-00370   Document 1-1   Filed 04/19/11   Page 33 of 102 PageID #: 42

## 15. MARINE EXTENSION CLAUSES:

Notwithstanding anything to the contrary in or endorsed on this policy, it is understood and agreed that the following terms and conditions shall apply to all shipments which become at risk hereunder:

(1) This insurance attaches from the time the goods and/or merchandise and/or property leave the warehouse at the place named in the policy, special policy, certificate or declaration for the commencement of the transit and continues until the goods and/or merchandise and/or property are delivered to the final warehouse at the destination named in the policy, special policy, certificate or declaration, or a substituted destination as provided in Clause (3) hereunder.

(2) This insurance specially to cover the goods during,

(i) deviation, delay, forced discharge, re-shipment and transshipment.

(ii) any other variation of the adventure arising from the exercise of a liberty granted to the shipowner or charterer under the contract of affreightment.

(3) In the event of the exercise of any liberty granted to the shipowner or charterer under the contract of affreightment whereby such contract is terminated at a port or place other than original insured destination, the insurance continues until the goods and/or merchandise and/or property are sold and delivered at such port or place; or, if the goods and/or merchandise and/or property be not sold but are forwarded to the original insured destination or to any other destination this insurance continues until the goods and/or merchandise and/or property have arrived at final warehouse as provided in Clause (1).

(4) If while this insurance is still in force and before the expiry of 15 days from midnight of the day on which the discharge overside of the goods hereby insured from the overseas vessel at the final port of discharge is completed, the goods and/or merchandise and/or property are re-sold (not being a sale within the terms of Clause (3) and are to be forwarded to a destination other than that covered by this insurance, the goods and/or merchandise and/or property are covered hereunder while deposited at such port of discharge until again in transit or until the expiry of the aforementioned 15 days, whichever shall first occur. If a sale is effected after the expiry of the aforementioned 15 days while this insurance is still in force the protection afforded hereunder shall cease as from the time of the sale.

Case 3:11-cv-00370   Document 1-1   Filed 04/19/11   Page 34 of 102 PageID #: 43

(5) Held covered, at a premium to be arranged, in case of change of voyage or of any omission or error in the description of the interest, vessel or voyage.

(6) This insurance shall in no case be deemed to extend to cover loss, damage or expense proximately caused by delay or inherent vice or nature of the subject matter insured.

(7) It is a condition of this insurance that there shall be no interruption or suspension of transit unless due to circumstances beyond the control of the Assured.

All other terms, conditions and warranties of the policy not in conflict with the foregoing remain unchanged, it being particularly understood and agreed that the F. C. & S. warranty specified in this policy remains in full force and effect, and that nothing in the foregoing shall be construed as extending this insurance to cover any risks of war or consequences of hostilities.

## 16.  BUYERS AND SELLER'S INTEREST:

Regardless of the terms of purchase by The Assured from suppliers or the terms of sale by The Assured to their customers, this policy, subject to all of its terms and conditions, attaches and fully covers the goods and/or merchandise and/or property continuously from warehouse to warehouse. This Assurer hereby acknowledges the insurable interest of The Assured and their liability thereto in the event of claims for loss or damage.

In the event a claim arises under this clause, The Assured agrees to use all reasonable means to recover the full amount of such loss from the importer/exporter in accordance with the terms of purchase/sale. Should a claim be paid under this clause, The Assured agrees to subrogate to this Company all rights of recovery from the importer/exporter, importer's/exporter's insurance or other responsible party.

Case 3:11-cv-00370   Document 1-1   Filed 04/19/11   Page 35 of 102 PageID #: 44

17. **SOUTH AMERICAN CLAUSE:**

With respect to shipments of goods and/or merchandise and/or property to South America and notwithstanding anything contained elsewhere herein to the contrary (particularly the Warehouse to Warehouse and Marine Extension Clause), the insurance provided hereunder shall continue to cover for sixty (60) days, (ninety (90) days on shipments via the Magdalena River) after completion of discharge of the overseas vessel at port of destination or until the goods and/or merchandise and/or property are delivered to the final warehouse at destination, whichever may first occur, and shall then terminate:

The time limit referred to above to be reckoned from midnight of the day on which the discharge of the overseas vessel is completed.

18. **ERRORS AND OMISSIONS:**

This policy shall not be vitiated by any unintentional delay, error, omission or oversight in making any declaration that is required to be made under any provision contained in or endorsed on this policy provided a correct declaration is communicated to This Assurer as soon as practicable after the delay, error, omission or oversight becomes known to The Assured's corporate risk manager or equivalent, and premium paid, if required by This Assurer.

19. **DEVIATION:**

This insurance shall not be vitiated by any unintentional error in description of vessel, voyage or interest, or by deviation, over carriage, change of voyage, transshipment or any other interruption of the ordinary course of transit from causes beyond the control of The Assured. It is agreed, however, that any such error, deviation or other occurrence mentioned above shall be reported to This Assurer as soon as known to The Assured's corporate risk manager or equivalent.

20. **CHANGE OF DESTINATION/DEVIATION DELAY CLAUSE:**

Notwithstanding anything to the contrary herein, including the Warehouse to Warehouse and Marine Extension Clause, in case of voluntary change of destination and/or deviation and/or delay, within The Assured's control, the insured goods are held covered at an additional premium to be agreed, if required; The Assured agreeing to report, as soon as possible, all such events to This Assurer.

In case of short shipment in whole or in part by the vessel reported for insurance hereunder, This Assurer agrees to hold The Assured covered against the risks insured hereunder until arrival at the final destination to which the goods are insured or until the goods are no longer at the risk of The Assured.

Case 3:11-cv-00370   Document 1-1   Filed 04/19/11   Page 36 of 102 PageID #: 45

**21. CONSOLIDATION, REPACKING:**

In consideration of premium as agreed and notwithstanding anything to the contrary herein, including the Warehouse to Warehouse and Marine Extension clause, the insurance provided under this policy shall also cover the goods and/or merchandise and/or property insured while on premises of freight forwarders, export packers, consolidators, truckers, warehousemen, suppliers, distribution centers, or others, including The Assured's premises, for the purpose of storage, unpacking, packing or repacking, consolidation, deconsolidation, containerization, decontainerization, distribution or otherwise anywhere in the World whether prior to loading or after discharge from overseas vessel for a period not exceeding sixty (60) days after arrival at such premises. Thereafter the insurance continues whilst in transit until the goods and/or merchandise and/or property are delivered to the final warehouse at destination as provided elsewhere herein. Held covered at a premium to be arranged, if required, in the event of delay in excess of the above time limit

**21. SHORE PERILS:**

Unless otherwise agreed, goods and/or merchandise and/or property insured hereunder while on the docks, wharves, quays, or elsewhere on shore and/or during land transportation are also covered against loss, damage or expense caused by fire, sprinkler leakage, lightning, cyclone, hurricane, earthquake, windstorm, hail, landslide, volcanic eruption, flood, rising water, aircraft, objects falling from aircraft, collision, derailment and/or any accident to the conveyance, collapse and/or subsidence of docks, wharves, quays and/or structures notwithstanding any average warranty herein. Nothing in the foregoing shall be construed to include such risks as are excepted by the Free of Capture and Seizure and the Strikes, Riots and Civil Commotions Warranties.

**22. WAREHOUSING, FORWARDING CHARGES:**

In the event of frustration, interruption, or termination of the insured voyage, or similar events beyond the control of The Assured and in addition to the limit(s) of liability set forth elsewhere in this policy, This Assurer agrees to pay all landing, warehousing, transshipping, forwarding and other expenses incurred by The Assured to forward the insured goods and/or merchandise and/or property to the original or substituted final destination should same be incurred by reason of a risk insured against, including as a result of the insolvency or financial default of the owner, charterer, manager or operator of the vessel or other conveyance.

In such circumstances and notwithstanding any average warranty contained elsewhere in this policy, This Assurer will also pay (i) any partial loss or damage to the shipment arising from any loading, transshipment, forwarding or discharge and (ii) the full insured value of any package, piece or unit in the shipment which

Case 3:11-cv-00370   Document 1-1   Filed 04/19/11   Page 37 of 102 PageID #: 46

is totally lost in loading, transshipment, forwarding or discharge, including loss of and damage to any such package, piece or unit which may be reasonably attributed to discharge at a port of distress.

23. **GENERAL AVERAGE:**

General Average, Salvage and Special Charges and expenses are payable as provided in the contract of affreightment or in accordance with laws and usages at the port of destination or in accordance with foreign statement.

24. **LOADING/UNLOADING:**

This insurance is extended to cover, subject to the applicable insuring terms, conditions and warranties set forth elsewhere in this policy, goods and/or merchandise and/or property intended for shipment (i) during the loading process prior to dispatch (including, but not limited to, into containers, trailers and rail cars) and continuing thereafter while they await the commencement of the transit and (ii) after they arrive at the final destination and continuing thereafter, until they are unloaded (including, but not limited to, from containers, trailers and rail cars) and throughout the unloading process, but not exceeding 7 days after arrival at final destination, unless covered elsewhere herein. Periods in excess of 7 days held covered provided notice be given to This Assurer as soon as practicable; subject to additional premium if required.

25. **FPA:**

Unless otherwise agreed this insurance is free of particular average unless the vessel and/or craft be stranded, sunk, burnt, on fire or in collision with another ship or vessel, or loss of and/or damage to the interest hereby insured which may reasonably be attributed to fire or contact (other than collision with another ship or vessel) of the vessel and/or craft with any substance, ice included, other than water, but including jettison and/or washing and/or loss overboard, irrespective of percentage.

26. **INSUFFICIENCY OF PACKAGING:**

In the event of a claim being made for loss or damage which is alleged to be caused by insufficiency or unsuitability of packing or preparation of the subject matter insured, This Assurer hereby agrees that it will not assert such alleged insufficiency or unsuitability as a defense against the claim in any case where the packing or preparation was carried out by a party other than The Assured and the insufficiency or unsuitability arose without The Assured's privity or knowledge. For the purpose of this clause, "packing" shall be deemed to include, but not limited to, stowage in a container, trailer, railcar or liftvan.

Case 3:11-cv-00370   Document 1-1   Filed 04/19/11   Page 38 of 102 PageID #: 47

**27. SHORTAGE FROM CONTAINER ETC:**

This Assurer is also to pay for shortage of contents, meaning thereby, the difference between the number of items loaded or alleged to have been loaded in the container, trailer, railcar or liftvan as per the shipper's or supplier's invoice or packing list or any other accepted document of The Assured's trade and/or business, and the number of items removed therefrom and received by The Assured, consignee or their agent, at the time the container, trailer, railcar or liftvan is unloaded howsoever, wheresoever and whensoever occurring, notwithstanding the container seals may appear to be intact.

**28. CONCEALED DAMAGE:**

Should delay occur in opening of packages and/or cargoes and/or cases after arrival of the goods and/or merchandise and/or property at destination, as provided for in the policy, and damage found when packages are eventually opened, but not later than ninety (90) days after arrival at location or warehouse at destination, such damage shall be deemed to have occurred during the currency of this insurance. Claims on such goods to be adjusted and paid by This Assurer in the same manner as though the packages had been opened immediately upon their arrival.

If damage is discovered after the 90 day period, but the damage occurred during the period of coverage under this policy, the burden to show when the damage occurred shall revert to The Assured.

Packages showing evidence of damage are to be opened immediately upon arrival at destination and exceptions noted on the carrier's receipt (s).

Nothing herein, however, shall be construed to limit the coverage already provided particularly but not limited to the "Warehouse to Warehouse Clause" and "Marine Extension Clause" of the policy.

**29. SUE & LABOR CLAUSE:**

In case of any imminent or actual loss or misfortune it shall be lawful and necessary to and for The Assured his or their factors, servants and assigns, to sue, labor and travel for, in and about the defense, safeguard and recovery of the goods and/or merchandise and/or property, or any part thereof, without prejudice to this insurance; nor shall the acts of The Assured or This Assurer, in recovering, saving and preserving the goods and/or merchandise and/or property insured, in case of disaster, be considered a waiver or an acceptance of abandonment. This Assurer will pay all such sue and labor expenses subject to the limit of liability set forth elsewhere in this policy.

Case 3:11-cv-00370   Document 1-1   Filed 04/19/11   Page 39 of 102 PageID #: 48

30. **INCHMAREE CLAUSE:**

This insurance is also specially to cover any loss of or damage to the interest insured hereunder, through the bursting of boilers, breakage of shafts or through any latent defect in the machinery, hull or appurtenances, or from faults or errors in the navigation and/or management of the vessel by the Master, Mariners, Mates, Engineers or Pilots.

31. **EXPLOSION CLAUSE:**

The risks covered by this policy are to include loss, damage or expense resulting from explosion, howsoever and wheresoever occurring, irrespective of percentage, but excluding the risks excepted by the F. C. & S. and Strikes, Riots and Civil Commotions warranties, appearing elsewhere in this policy.

32. **BOTH TO BLAME COLLISION CLAUSE:**

Where goods are shipped under a Bill of Lading containing the so-called "Both to Blame Collision Clause" This Assurer agrees as to all losses covered by this insurance, to indemnify The Assured for any amount (not exceeding the amount insured) which The Assured may be legally bound to pay to the shipowners under such clause. In the event that such liability is asserted The Assured agrees to notify This Assurer who shall have the right, at their own cost and expense, to defend The Assured against such claim.

33. **CARRIER CLAUSE:**

Warranted that this insurance shall not inure, directly or indirectly, to the benefit of any carrier or bailee.

34. **CRAFT, ETC.:**

Including the risk by craft, raft and/or lighter to and from the vessel. Each craft, raft and/or lighter to be deemed separately insured. Also to cover any special or supplementary lighterage to take the goods and/or merchandise and/or property to or from the warehouse. The Assured is not to be prejudiced by any agreement exempting lightermen from liability.

35. **NEGLIGENCE:**

The Assured is not to be prejudiced by the presence of the negligence clause and/or latent defect clause in the Bills of Lading, Charter Party and/or contract of affreightment or other contract. The seaworthiness of the vessel, as between The Assured and This Assurer, is hereby admitted and the wrongful act or misconduct of the shipowner, charterer, or carrier or his servants causing loss shall not defeat

Case 3:11-cv-00370   Document 1-1   Filed 04/19/11   Page 40 of 102 PageID #: 49

recovery under this policy, if the loss, damage or expense in the absence of wrongful act or misconduct would have been a loss, damage or expense under this policy.

## 36. FRAUDULENT BILLS OF LADING:

This policy also covers physical loss incurred by The Assured through the acceptance by The Assured, its Agents or the shipper of fraudulent bills of lading, shipping receipts, messenger receipts, warehouse receipts or other shipping documents. Also physical loss or damage caused by the utilization of legitimate bills of lading and/or other shipping documents without the authorization and/or consent of The Assured or its agents.

## 37. WAIVER AND/OR RELEASE:

Privilege is given The Assured to accept contracts of carriage, charters and/or Bill of Lading and/or receipts, from common carriers and/or owners and/or operators of tugs, barges and/or lighters or terminals, containing usual waivers and/or releases of liabilities, provided such acceptance is made prior to any known or reported loss or accident. Privilege is also granted The Assured to execute railroad sidetrack agreements with or without a release of liability.

The Assured is granted the privilege of accepting contracts of carriage, charters and/or Bills of Lading containing waivers and/or releases of liabilities from owners and/or operators of tugs, barges and/or lighters involved in a sea passage.

## 38. PARAMOUNT WARRANTIES:

The following warranties shall be paramount and shall not be modified or superseded by any other provision included herein or stamped or endorsed hereon unless such other provision refers specifically to the risks excluded by these warranties and expressly assumes the said risks.

(A)  F.C. & S. Warranty (April 3, 1980)

**Notwithstanding anything herein contained to the contrary, this insurance is warranted free from:**

(1)  Capture, seizure, arrest, restraint, detainment, confiscation, preemption, requisition or nationalization, and the consequences thereof or any attempt thereat, whether in time of peace or war and whether lawful or otherwise;

(2)  All loss, damage or expense, whether in time of peace or war, caused by (i) any weapon of war employing atomic or nuclear fission and/or fusion and/or other reaction or radioactive force or matter or (ii) any mine or torpedo.

Case 3:11-cv-00370   Document 1-1   Filed 04/19/11   Page 41 of 102 PageID #: 50

(3) All consequences of hostilities or warlike operations (whether there be a declaration of war or not), but this warranty shall not exclude collision or contact with aircraft, or with rockets or similar missiles (other than a mine or torpedo), stranding, heavy weather, fire or explosion unless caused directly (and independently of the nature of the voyage or service which the vessel concerned or, in the case of a collision, any other vessel involved therein, is performing) by a hostile act by or against a belligerent power; and for the purposes of this warranty "power" includes any authority maintaining naval, military or air forces in association with a power.

(4) The consequences of civil war, revolution, rebellion, insurrection, or civil strife arising therefrom; or from the consequences of the imposition of martial law, military or usurped power; or piracy.

(B) SR & CC WARRANTY

**Notwithstanding anything herein contained to contrary, this insurance is warranted free from loss, damage or expense caused by or resulting from:**

(1) strikes, lockouts, labor disturbances, riots, civil commotions, or the acts of any person or persons taking part in any such occurrence or disorders;

(2) vandalism, sabotage or malicious act, which shall be deemed also to encompass the act or acts of one or more persons, whether or not agents of a sovereign power, carried out for political, terroristic or ideological purposes and whether any loss, damage or expense resulting therefrom is accidental or intentional.

(C) CLAUSE PARAMOUNT NUCLEAR EXCLUSION:   (AIMU APRIL 1, 1991)

Notwithstanding anything to the contrary herein, it is hereby understood and agreed that this policy shall not apply to any loss, damage, or expense due to or arising out of, whether directly or indirectly, nuclear reaction, radiation, or radioactive contamination, regardless of how it was caused.  However, subject to all provisions of this policy, if this policy insures against fire, then direct physical damage to the property insured located within the United States, or any territory of the United States or Puerto Rico, by fire directly caused by the above excluded perils, is insured, provided that the nuclear reaction, radiation, or radioactive contamination was not caused, whether directly or indirectly, by any of the perils excluded by the F.C. & S. Warranty of this policy.

Nothing in this clause shall be construed to cover any loss, damage, liability, or expense caused by nuclear reaction, radiation, or radioactive contamination arising directly or indirectly from the fire mentioned above.

Case 3:11-cv-00370   Document 1-1   Filed 04/19/11   Page 42 of 102 PageID #: 51

(D) DELAY:

This insurance is warranted free from, and shall not cover, loss of market or loss, damage, deterioration or expense arising from delay, regardless of whether such delay is caused by a risk insured against or otherwise, unless such risks are expressly assumed elsewhere in this policy.

### 39. CONTAINER DEMURRAGE CHARGES:

This policy shall cover demurrage charges and/or late penalties assessed against, and paid by, The Assured for late return of containers, trailers, railcars or liftvans when they are retained by the The Assured at the instruction of This Assurer for inspection by This Assurer's surveyor in investigation of loss or damage.

The time period for which This Assurer shall be liable for said charges and/or penalties shall begin at the time This Assurer instructs The Assured to retain the containers for inspection and end at the time This Assurer's surveyor instructs The Assured to return the containers.

### 40. FUMIGATION:

In the event of the conveyance and/or location being fumigated by order of a properly constituted authority and loss or damage to the interest insured hereunder arises therefrom, This Assurer agrees to indemnify The Assured for such loss or damage, and The Assured hereby agrees to subrogate to This Assurer any recourse they may have for recovery of such loss or damage from others.

### 41. RECOOPERING/REPACKING:

In the event the packaging of the goods and/or merchandise and/or property insured under this policy is damaged due to a risk insured against as a result of which it is necessary, to recooper or provide new packaging, This Assurer will pay the cost of recoopering and/or the cost of new packaging.

In respect of packaging which falls outside the above provisions, it is agreed that should the outer packaging be damaged from an insured risk which renders the insured goods and/or merchandise and/or property unfit for on-shipment or distribution, irrespective of the final destination shown herein, This Assurer will pay the expense of reasonable repackaging, provided such damage occurred during the currency of this insurance.

Case 3:11-cv-00370   Document 1-1   Filed 04/19/11   Page 43 of 102 PageID #: 52

42.  **BRANDS AND TRADEMARKS:**

In case of damage to goods and/or merchandise and/or property insured under this policy bearing a brand or trademark, the sale of which in any way carries or implies a guarantee, the salvage value of such damaged goods and/or merchandise and/or property shall be determined after removal of all brands and trademarks.

With respect to packaging from which the brand or trademark cannot be removed, the contents shall be transferred into plain packaging, subject always to the consent of The Assured.

With respect to any goods and/or merchandise and/or property for which it is deemed by The Assured to be impractical to destroy all evidence of The Assured's connection therewith, This Assurer agrees to waive its right to salvage and The Assured is granted the option to destroy such damaged goods and/or merchandise and/or property. If the Assured exercises its option to destroy such damaged goods and/or merchandise and/or property, This Assurer shall be given the opportunity to have a representative in attendance during such destruction.

The cost to remove brands and trademarks, as well as the cost to remove the contents from their original packaging and transfer them into plain packaging, shall be borne by This Assurer, but in no event shall This Assurer be liable for more than the insured value of the damaged goods and/or merchandise and/or property.

43.  **LABELS:**

In case of damage affecting labels, capsules or wrappers, This Assurer, if liable therefor under the terms of this policy, shall not be liable for more than an amount sufficient to pay the cost of new labels, capsules or wrappers and the cost of reconditioning the goods, but in no event shall This Assurer be liable for more than the insured value of the damaged merchandise.

44.  **PAIR AND SETS:**

It is understood and agreed that the loss of or damage to any one item of the goods and/or merchandise and/or property insured under this policy which consist of items in a pair or set, shall constitute a total loss of such pair or set.

Case 3:11-cv-00370   Document 1-1   Filed 04/19/11   Page 44 of 102 PageID #: 53

### 45. SIGHT DRAFT EXTENSION:

This policy is extended to cover shipments insured hereunder and made under sight draft, time draft, open account or similar terms while temporarily delayed in the country of destination for not exceeding sixty (60) days from date of arrival at destination, or until draft is paid or until delivered to buyer's warehouse or other warehouse designated by the buyer, whichever may first occur.

This extension of coverage to apply whether the merchandise is in due course of transit or otherwise and regardless of whether such delay is for the convenience of The Assured or upon their instructions. Held covered for an additional period of time to be agreed at additional premium to be named, provided The Assured gives notice of all shipments so held as soon as practicable.

### 46. REFUSED/RETURNED SHIPMENTS:

In the event of refusal or inability of The Assured or other consignee to accept delivery of merchandise insured hereunder, this insurance is extended to cover such shipments during delay and/or return or reshipment, or until received by The Assured, or until otherwise disposed of.

### 47. DEBRIS REMOVAL:

This policy covers expenses incurred for the removal and disposal of all debris of the property covered hereunder which may be occasioned by loss caused by any of the perils insured, except that This Assurer shall not be liable under this clause for more than 10% of the insured value of the goods and/or merchandise and/or property. Nothing contained herein shall be construed to cover any clean up expenses for which the The Assured may be liable under any pollution statute.

### 48. PARTIAL LOSS CLAUSE:

In case of a partial loss to the goods and/or merchandise and/or property insured under this policy caused by risks insured against, the loss shall be determined by a separation of sound and damaged goods and/or merchandise and/or property and the amount of recoverable loss shall be determined by:

a)    an agreed estimate (by survey) of the percentage of damage of such damaged portion, or if such agreement is not practicable,

b)    then such damaged portion shall be sold at public sale, in which event the amount of the loss shall be the difference between the net amount so realized by the sale and the insured value of the portion so sold.

Case 3:11-cv-00370   Document 1-1   Filed 04/19/11   Page 45 of 102 PageID #: 54

**49. CONSTRUCTIVE TOTAL LOSS:**

No recovery for a constructive total loss shall be had under this policy unless (i) the insured goods and/or merchandise and/or property are reasonably abandoned on account of their actual total loss appearing to be unavoidable, or (ii) because they cannot be preserved from actual total loss without incurring an expenditure which, if incurred, The Assured reasonably believes would exceed the expected value of the goods and/or merchandise and/or property.

**50. MACHINERY CLAUSE:**

In case of loss or damage to any part of a machine or other article consisting, when complete for sale or use, of several parts, then in case of loss or damage covered by this insurance to any part of such machine or article, This Assurer shall be liable only for the proportion of the insured value applicable to the part or parts lost or damaged, or at The Assured's option, for the cost and expense of replacing, duplicating, assembling, or repairing the lost or damaged part or parts lost or damaged (including duty and/or any expediting, labor or installation charges) so that the machine or article is restored to its condition at the time of shipment, but in no event shall the Company be liable for more than the insured value of the complete machine or article.

**51. CONTROL OF DAMAGED GOODS AND/OR MERCHANDISE AND/OR PROPERTY:**

Notwithstanding anything to the contrary contained elsewhere in this policy, it is understood and agreed that in case of damage to goods and/or merchandise and/or property insured under this policy, The Assured is to retain full and absolute discretion and control over the disposition of all such goods and/or merchandise and/or property. It is understood that The Assured shall be the sole judge as to whether disposal or sale of such goods and/or merchandise and/or property is detrimental to its interest. This Assurer shall be given the opportunity to have a representative in attendance.

Any goods and/or merchandise and/or property which The Assured deems unfit for sale or which it is unable to sell or dispose of under its agreement with any trade association or other entity, shall be treated as a constructive total loss, and The Assured shall dispose of the goods and/or merchandise and/or property to its best advantage with This Assurer being entitled to its share of the net proceeds resulting from such disposition, or the goods and/or merchandise and/or property shall be destroyed after notification to This Assurer and any expenses incurred in connection with such destruction shall be borne by This Assurer. This Assurer shall be given the opportunity to have a representative in attendance during such destruction.

Case 3:11-cv-00370   Document 1-1   Filed 04/19/11   Page 46 of 102 PageID #: 55

## 52. NOTICE OF LOSS:

Unless instructions have been given to the contrary, The Assured shall report to Willis Marine for transmission to This Assurer, or to The agents of This Assurer if there be one at or near the place where the loss occurs or expenses are incurred or, if there be none in the vicinity, to the correspondent of the American Institute of Marine Underwriters or to Lloyd's Agent, every loss or damage which may become a claim under this insurance as soon as may be practicable after it becomes known to The Assured's corporate risk manager or equivalent.

## 53. PAYMENT OF LOSS:

In case of loss under this insurance, same to be paid within thirty (30) days after satisfactory proof of loss and proof of interest has been filed with This Assurer.

Notwithstanding the foregoing, where such proofs have been established and only the final amount of claim cannot be determined within the thirty days, This Assurer shall advance as a loan to The Assured an agreed amount not to exceed 75% of the provisional claim amount. Any amount so advanced in excess of the final claim amount is to be refunded to This Assurer by The Assured.

It is also agreed that claims for loss of or damage to insured goods and/or merchandise and/or property falling within the scope of this policy which amount to less than $2,500. - - as adjusted, shall be paid by This Assurer within 10 days following the submission of the following applicable supporting documents:

(a)     bill of lading or air waybill or warehouse receipt;
(b)     commercial invoice;
(c)     claim against carrier/warehouse/other responsible party;
(d)     certificate of insurance, if applicable
(e)     any writing stating that a loss has occurred, e.g., (but without limitation) statement of claim from The Assured or its customer, or exceptions taken on delivery if included with original submission or customer credit memo.

If the terms of this policy provide coverage for loss due to non-delivery, then in the event of a non-delivery claim above $2,500 in which the carrier involved has not or will not provide a confirmation of non-delivery within a reasonable time, This Assurer agrees to advance to The Assured the amount of loss without interest pending receipt of the confirmation of non-delivery from the carrier. Repayment of the loss to This Assurer is conditional upon and only to the extent of the amount made good in recovery, either by The Assured or by This Assurer, taking into account pro-ration of recovery between Assurers liability and Assured's retention, in the event of deductible being applicable. For the purposes of this paragraph, the definition of "Reasonable Time" shall be one month after The Assured's written request for confirmation of non-delivery from the carrier.

Case 3:11-cv-00370   Document 1-1   Filed 04/19/11   Page 47 of 102 PageID #: 56

### 54. INTERRUPTION OF TRANSIT OF DAMAGED GOODS:

It is agreed that goods taken out of ordinary transit upon instructions of surveyors appointed by or on behalf of This Assurer for the purpose of establishment of loss or damage, shall be held covered, subject to the original terms and conditions applying to such shipment, without payment of additional premium or advice to This Assurer, during such interruption or suspension of transit until disposed of by delivery to and acceptance by the original consignee or by sale to others or otherwise.

### 55. EXPEDITING EXPENSES:

Where there is loss, damage, general average, salvage and/or special charges which are, or will be, the subject of a claim under this policy, and The Assured considers it necessary to forward replacements and/or replacement parts by means other than the means by which the original shipment was dispatched, This Assurer will pay the reasonable expediting costs so involved in addition to the underlying claim.

### 56. DELIBERATE DAMAGE- POLLUTION HAZARD:

This insurance is extended to cover, but only while the property insured is on board a waterborne conveyance, loss of or damage to said property directly caused by governmental authorities acting for the public welfare to prevent or mitigate a pollution hazard or threat thereof, provided that the accident or occurrence creating the situation which required such governmental action would have resulted in a recoverable claim under the Policy (subject to all of its terms, conditions and warranties) if the property insured would have sustained physical loss or damage as a direct result of such accident or occurrence.

This agreement shall not increase the Limits of Liability provided for elsewhere in the Policy.

### 57. DELIBERATE DAMAGE - SERVICES:

This insurance also covers, notwithstanding the F.C. & S. warranty specified in this policy, and subject to all other insuring terms, conditions and warranties set forth elsewhere in this policy, physical loss of and damage to the goods and/or merchandise and/or property arising out of the performance of inspection duties by customs service agents or other duly constituted governmental agencies.

Case 3:11-cv-00370   Document 1-1   Filed 04/19/11   Page 48 of 102 PageID #: 57

**58. OVERDUE MEANS OF CONVEYANCE:**

If thirty days lapse after anticipated arrival of the carrying conveyance and no news has been received then the goods and/or merchandise and/or property insured under this policy will be considered lost. This Assurer agrees to pay the insured value of the missing items.

If the goods and/or merchandise and/or property are located after the time limitation noted above The Assured may still avail themselves of the protection afforded by the Brands and/or Labels and/or Control of Damaged Goods clause noted elsewhere in this policy.

Notwithstanding the above, in the event the goods and/or merchandise and/or property are located in an undamaged condition The Assured has the option to accept them (returning underwriters payment less any Sue and Labor Expenses and/or Particular Charges), or assist underwriters in disposing of the goods and/or merchandise and/or property. Said proceeds will be for the account of underwriters.

**59. BROKER'S CLAUSE:**

It is a condition of this Policy, and it is hereby agreed that The Assured's Brokers, Willis Marine shall be deemed to be exclusively the agents of The Assured and not of This Assurer. Any notice given or delivered by or on behalf of This Assurer to the said Brokers in connection with or affecting this insurance, or its cancellation, shall be deemed to have been delivered to The Assured.

**60. DECLARATION OF RISKS:**

Authority is hereby given The Assured to issue and countersign This Assurer's Certificates and/or special policies (including endorsements thereto) on any and/or all shipments insured hereunder, but only subject to the terms and conditions of this policy, it being understood and agreed that all certificates and/or special policies and/or endorsements shall be countersigned by a duly authorized representative of The Assured. Shipments on which certificate and/or special policies are not required may be reported by special declaration forms furnished to The Assured.

It is a condition of this policy that The Assured shall declare to Willis Marine as Brokers for the The Assured, for transmission to This Assurer, as soon as practicable, unless otherwise agreed, copies of all certificates and/or special policies, declarations and endorsements for each and every shipment coming within the terms of this policy, whether arrived or not.

Case 3:11-cv-00370   Document 1-1   Filed 04/19/11   Page 49 of 102 PageID #: 58

**61. LETTER OF CREDIT CLAUSE:**

Permission is also granted to The Assured to attach the London Institute Cargo Clauses (A, B and C) and War, Strikes, Riots and Civil Commotions Clauses dated 1/1/82 or other London or American Institute Clauses to policies and/or certificates of insurance where such clauses are required by the terms of sale, letter of credit or other banking requirements. Such clauses are deemed to be added to this policy in these instances.

The difference in conditions between such Institute Clauses and this policy are covered hereunder.

**62. INSPECTION OF RECORDS:**

This Assurer, or its agent, shall have the privilege at any time during business hours to inspect the records of The Assured as respects shipments coming within the terms of this Policy. This company agrees to give The Assured a minimum 7-day written notification of their intent to exercise this privilege. This privilege expires twelve (12) months after final termination of this policy.

**63. DUTY AND/OR COLLECT FREIGHT:**

This insurance also covers, subject to policy terms of average, the risk of partial loss by reason of perils insured against on the import duties imposed on property insured hereunder and Collect Freight (unless guaranteed or payable "vessel lost or not lost"), it being understood and agreed, however, that when the risk upon the goods continues beyond the time of landing from the overseas vessel, the increased value, consequent upon the payment of such duties, and/or freight shall attach as an additional insurance upon the goods from the time such import duty and/or freight is paid or becomes due, to the extent of the amounts thereof actually paid or payable.

Any limit of liability expressed in this policy shall be applied separately to such increased value.

If required herein, a separate amount shall be reported sufficient to cover the said duty, and/or freight and upon which the rate of premium shall be an agreed percentage of the merchandise rate(s) appearing in the rate schedule.

The Assured will, in all cases, use reasonable efforts to obtain abatement or refund of import duties paid or claimed in respect to goods lost, damaged or destroyed. It is further agreed that The Assured shall, when This Assurer so elects, surrender the merchandise to the Customs Authorities and recover import duties thereon as provided by law, in which event the claim under this policy shall be only for a total loss of the merchandise so surrendered and expenses.

Case 3:11-cv-00370   Document 1-1   Filed 04/19/11   Page 50 of 102 PageID #: 59

This insurance on import duty and/or freight shall terminate at the end of the import movement covered under this policy (including the Warehouse to Warehouse and/or Marine Extension Clauses) but nothing contained in these clauses shall alter or affect any coverage granted elsewhere in the policy during the storage or transit subsequent thereto.

**64.** **OTHER INSURANCE:**

In case the goods and/or merchandise and/or property, insured under this policy are covered by other insurance (except as hereinafter provided), the covered loss, damage or expense shall be collected from the several policies in the order of the date of their attachment.

Insurances attaching on the same date are deemed simultaneous and are to contribute pro rata; provided, however, that where any fire insurance, or any insurance (including fire) taken out by any carrier or bailee (other than The Assured) is available to the beneficiary of this policy, or would be so available if this insurance did not exist, then this insurance shall be void to the extent that such other insurance is or would have been available.

It is agreed, nevertheless, that where This Assurer is thus relieved of a liability because of the existence of other insurance, This Assurer shall receive and retain the premium payable under this policy and, in consideration thereof, shall guarantee the solvency of the companies and/or Assurers who issued such other insurance and the prompt collection of the loss, damage or expense thereunder, but only to the same extent that This Assurer shall have been relieved of liability by reason of the terms of this Clause and not exceeding, in any case, the amount which would have been collectible under this policy if such other insurance did not exist.

**65.** **DIFFERENCE IN CONDITIONS:**

With respect to goods and/or merchandise and/or property purchased by The Assured on C.I.F. or similar terms, where transit insurance is arranged by the seller or others, this insurance is extended to cover the difference in the terms, conditions and warranties of such other insurance and the terms, conditions and warranties of this insurance, if the goods and/or merchandise and/or property would otherwise have been insured hereunder.

All goods and/or merchandise and/or property insured under this Clause shall be valued as per the valuation provisions set forth elsewhere in this policy.

It is noted and agreed that where The Assured is obliged by legislation or otherwise to arrange transit insurance locally, it shall continue to have the full benefit and protection of this insurance for any difference between this insurance and the terms, conditions and warranties in the insurance arranged elsewhere.

Case 3:11-cv-00370   Document 1-1   Filed 04/19/11   Page 51 of 102 PageID #: 60

It is agreed that nothing in this Clause shall be construed to extend the obligation of This Assurer to pay more than the limit(s) of liability set forth elsewhere in this policy.

66. **GUARANTEE OF COLLECTIBILITY:**

With respect to all goods and/or merchandise and/or property purchased by The Assured on C.I.F. or similar terms, where the seller is required to furnish transit insurance, This Assurer guarantees collection of any claim recoverable under the terms, conditions and warranties of the seller's transit insurance, but not exceeding the terms, conditions or limits of this policy..

In no event shall this insurance inure to the benefit of the seller or his Assurer, and The Assured agrees to make, and will make, all reasonable efforts to collect the full amount of any loss, damage or expense from the seller and his Assurer, but in the event The Assured is unsuccessful in making a recovery, This Assurer will advance to The Assured the amount of the uncollected loss, damage or expense as a loan without interest.

Such advance shall be repayable upon, but subject to and only to the extent of (i) the receipt of the purchase price by The Assured or (ii) any recovery received by The Assured from insurance effected by the seller or otherwise.

67. **F.O.B., FAS., ETC., SHIPMENTS:**

This insurance is extended to cover goods and/or merchandise and/or property sold by the The Assured on F.O.B., F.A.S., Cost and Freight or similar terms whereby the The Assured is not obligated to furnish marine insurance. This policy attaches subject to its terms and conditions and continues until the goods and/or merchandise and/or property are loaded onto the primary conveyance or until The Assured's interest ceases.

68. **INCREASED VALUE AND/OR PROFITS INSURANCE:**

Additional Insurance and/or Increased Value Insurance and/or Profits Insurance, on shipments purchased by The Assured on C.I.F. or similar terms whereby the The Assured is not required to provide marine insurance are covered hereunder, subject to this policy's terms and conditions, as per the following conditions:

(a)     To pay the same percentage of loss on additional insurance and/or increased value and/or profits insured hereunder as This Assurer would pay on cargo insured subject to the terms and conditions of this policy but in the event the goods on which the additional insurance and/or increased value and/or profits are insured hereunder are short-delivered or sold unidentifiable at the seaport of destination in consequence of perils insured

Case 3:11-cv-00370   Document 1-1   Filed 04/19/11   Page 52 of 102 PageID #: 61

against to pay a total loss on the additional insurance and/or increased value and/or profits on the part short-delivered or sold unidentifiable.

(b) In the event of partial loss, This Assurer shall not be liable for a greater percentage of the amount insured than would be payable on the cargo itself if insured by This Assurer. This insurance is to be free of claim for General Average and/or Salvage and/or Special Charges except on the excess of Contributory Value over the original amount insured and only if uncollectible under the original insurance.

(c) The valuation for this additional insurance to be the difference between the amount of the seller's insurance and the valuation as provided in Clause 8 of this Policy.

(d) Regarding the additional insurance provided under this clause, the Policy is proof of interest. Full interest admitted, without benefit of salvage.

## 69. UNPAID VENDORS:

This insurance is extended to cover the interest of The Assured, as a vendor in a credit transaction, on all shipments made by The Assured on terms under which The Assured is not obliged to furnish transit insurance.

This Assurer will guarantee to The Assured the prompt collection of losses, damages and expenses otherwise coming within the terms, conditions and warranties of this insurance in connection with shipments for which The Assured has not been paid. This Assurer will advance to The Assured the amount of the loss, damage or expense, as a loan without interest. Such advance shall be repayable upon, but subject to and only to the extent of (i) the receipt of the purchase price by The Assured, or (ii) any recovery received by The Assured from insurance effected by the buyer or otherwise.

It is agreed that the coverage provided under the terms of this Clause shall be subject to the applicable terms and conditions set forth elsewhere in this policy.

All goods and/or merchandise and/or property insured under this Clause shall be valued as per the valuation provisions set forth elsewhere in this policy.

The Assured agrees to not divulge the existence of the coverage provided by this Clause, and to use all reasonable means to collect the full amount due from the buyer or others, as the case may be.

Case 3:11-cv-00370   Document 1-1   Filed 04/19/11   Page 53 of 102 PageID #: 62

70. **SELLER'S INTEREST:**

Goods and/or merchandise and/or property sold by The Assured on F.O.B., F.A.S., Cost and Freight or similar terms whereby The Assured is not obligated to furnish transit insurance, will be covered under this policy, subject to all its terms and conditions, from the time the buyer fails or refuses to accept the goods and/or merchandise and/or property and/or the buyer cancels the contract prior to arrival of the shipments at final warehouse and/or The Assured exercises a lien on the goods and/or merchandise and/or property or interrupts their transit, or suspends the sale contract while the goods and/or merchandise and/or property are in transit when this is reasonable to safeguard his interest. Shipments insured under this clause will be valued at The Assured's selling price as per the contract of sale.

In any such cases this insurance will cover during delay and/or return of the goods or until they are otherwise disposed of.

The Assured agrees not to divulge the existence of the coverage to the buyer.

The Assured must use all reasonable and practical measures (including those which may be required by This Assurer) to prevent or minimize the loss and/or to enforce the sales contract.

71. **SUBROGATION CLAUSE:**

It is agreed that upon payment of any loss, damage or expense, This Assurer is to be subrogated to all the rights of The Assured, to the extent of the payment made, against any carrier, bailee or other third party, which may be liable for the loss, damage or expense.

However, it is agreed that no right of subrogation, except through General Average, shall lie against any Assured named in this policy and/or a subsidiary and/or affiliated and/or associated company or any additional Assured named herein; or against any vessel or craft or against any pipeline, on which cargo hereby insured is being carried or in respect of which freight insured hereunder is at risk, belonging in part or in whole to or chartered by the The Assured and/or a subsidiary and/or affiliated and/or associated company and/or an additional Assured named herein.

This Assurer may not bring suit solely in The Assured's name without prior permission from The Assured, but if granted, always at This Assurer's expense.

Case 3:11-cv-00370   Document 1-1   Filed 04/19/11   Page 54 of 102 PageID #: 63

Any recovery made by This Assurer in connection with a subrogated claim shall be shared with The Assured on a proportionate basis. The Assured's share shall be calculated by multiplying the gross recovery (after deducting only the actual expense of This Assurer to prosecute the claim) by the percentage obtained after dividing the sum of any deductible plus any uninsured loss, damage and expense by the sum of the deductible plus any uninsured loss, damage and expense plus the amount of loss, damage and expense paid by This Assurer. This Assurer retains the balance.

72. **SUIT AGAINST ASSURER:**

This Assurer agrees that any action or proceeding against This Assurer for the recovery of any claim under or by virtue of this insurance shall not be barred if commenced within the time prescribed therefor in the Statutes of the State of New York.

73. **CAPTIONS:**

The Captions to the Clauses set forth herein are for reference purposes only and shall not be deemed to form part of this policy.

74. **SUPERSEDING CLAUSE:**

The terms, conditions and warranties contained in this manuscript policy shall override anything that is at variance, or inconsistent with or contradictory to the printed policy to which this manuscript policy may be attached.

75. **REQUIRED BY LAW:**

Any provisions required by law to be stated in this policy by This Assurer are deemed to be stated herein.

76. **SUBSTITUTION:**

Wherever the words "This Assurer" or "The Assurer" may appear in the policy they are deemed to include also the words "These Assurers".

77. **SIGNATURE OF THIS ASSURER:**

In witness whereof, This Assurer has executed, issued and delivered this policy at New York, New York, this 1st day of January, 2004.

CONTINENTAL INSURANCE COMPANY

Authorized Representative

12FeB04

Case 3:11-cv-00370   Document 1-1   Filed 04/19/11   Page 55 of 102 PageID #: 64

## SCHEDULE OF MARINE RATES

**Effective with respect to shipments made on and after:** January 1, 2004

**Attached to and forming part of Policy Number:** OC 24-4422

**of the:** Continental Insurance Company

**ASSURED: Gibson Guitar Corporation**

Shipped on metal-hulled, self-propelled vessels which are not over 20 years of age, not less than 1000 net registered tons and which are classed A1 American Record or equivalent by a Member of the International Association of Classification Societies; or vessels over 20 years of age which are approved by this Assurer, and which are not less than 1000 net registered tons and classed as above, but only while operating in their regular trade; but in either case excluding vessels built (a) for services on the Great Lakes; (b) solely for military or naval service; or (c) for carriage of dry bulk or liquid cargoes, and which are more than 15 years of age, unless specifically approved by this company.

And including air carriers.

Vessels excluded or not provided for by the above wording but covered by the terms of the policy are covered at rates to be arranged.

**COVERING:** Merchandise incidental to the business of the assured as per clause no. 3 of this policy.

Coverage herein is subject to an Annual Minimum Deposit Premium of $150,000 and is based on estimated annual sales for the policy year of $195,630,000. As soon as practicable after anniversary, an adjustment of the Annual Minimum Deposit Premium shall be made based on a rate of .0766% on actual annual sales for the policy period.

There shall be no adjustment for either option unless estimated sales vary by 10% in either direction.

Areas on application are held covered at rates to be agreed.

Countersigned at New York, New York

This 1ˢᵗ day of January 1, 2004.

CONTINENTAL INSURANCE COMPANY

_Authorized Representative_

12FeB04

TGC
12FEB 04

Case 3:11-cv-00370   Document 1-1   Filed 04/19/11   Page 57 of 102 PageID #: 66

*Of the:* **Continental Insurance Company**

*Issued to:* **Gibson Guitar Corporation**

*Date:* **January 1, 2004**

### S.R. & C. C. Endorsement (Form No. 11A)

INSURANCE ALSO COVERS:

(1)   Physical loss of or damage to property insured directly caused by strikers, locked-out workmen, or persons taking part in labor disturbances or riots or civil commotions;

(2)   Physical loss of or damage to the property insured directly caused by vandalism, sabotage or malicious acts; and,

(3)   Physical loss of or damage to the property insured directly caused by the act or acts of one or more persons, whether or not agents of a sovereign power, carried out for political, terroristic or ideological purposes and whether any loss, damage or expense resulting therefrom is accidental or intentional; PROVIDED that any claim to be recoverable under this subsection (3) be not excluded by the F.C. & S. Warranty in the Policy to which this endorsement is attached. Notwithstanding the foregoing, coverage under this subsection (3) is conditional upon the property insured being in the ordinary course of transit and, in any event, **shall terminate:**

  *(a)* As per the Warehouse to Warehouse Clause, Marine Extension Clause, 60 Day South American Clause and any other clauses relating to duration of transit contained in or endorsed onto the Policy; *or,*

  *(b)* on delivery to the consignee's or other final warehouse or place of storage at the destination named herein; *or,*

  *(c)* on delivery to any warehouse or place of storage, whether prior to or at the destination named herein, which the Assured elects to use either for storage other than in the ordinary course of transit or for allocation or distribution; *or,*

  *(d)* in respect of marine transits, on the expiry of 60 days after completion of discharge overside of the property insured from the vessel at the port of discharge; *or,*

  *(e)* in respect of air transits, on the expiry of 30 days after unloading the property insured from the aircraft at the place of discharge;

Case 3:11-cv-00370   Document 1-1   Filed 04/19/11   Page 58 of 102 PageID #: 67

whichever shall first occur.

Notwithstanding the foregoing, nothing in this clause excludes coverage for the insured losses, which are otherwise covered by this insurance, caused by certified acts of terrorism, as defined in the Terrorism Risk Insurance Act (P.L. #107-297).

While the property insured is at risk under the terms and conditions of this insurance within the United States of America, the Commonwealth of Puerto Rico, the U.S. Virgin Islands and Canada, this insurance is extended to cover physical loss of or damage to the property insured directly caused by acts committed by an agent of any government, party or faction engaged in war, hostilities or other warlike operations, provided such agent is acting secretly and not in connection with any operation of military or naval armed forces in the country where the described property is situated.

Nothing in this endorsement shall be construed to cover any loss, damage or expense directly or indirectly arising from, contributed to or caused by any of the following, whether due to a peril insured against or otherwise:

    (a) change in temperature or humidity;

    (b) the absence, shortage, or withholding of power, fuel, or labor of any description whatsoever during any strike, lockout, labor disturbance, riot or civil commotion;

    (c) loss of market or loss, damage or deterioration arising from delay;

    (d) hostilities, warlike operations, civil war, revolution, rebellion or insurrection, or civil strife arising therefrom, except to the limited extent that the acts of certain agents acting secretly have been expressly covered above; or,

    (e) nuclear reaction, radiation or radioactive contamination.

The Assured agrees to report all shipments attaching under this cover and to pay premiums therefore at the rates established by the Assurer from time to time.

This endorsement may be canceled by either party upon forty-eight hours written, telegraphic or telefaxed notice to the other party, but such cancellation shall not affect any risks which have already attached hereunder.

Effective with respect to shipments made on or after **January 1, 2004**

All other terms and conditions remain unchanged.

Dated 1st day of January, 2004

CONTINENTAL INSURANCE COMPANY

Authorized Representative

12 Feb 04

**WAR RISK OPEN POLICY (CARGO)**
(December 2, 1993)

THIS POLICY OF INSURANCE WITNESSETH, that in consideration of premiums as agreed to be paid, the Assurer does make insurance and cause Gibson Guitar Corporation to be insured, lost or not lost, for account of whom it may concern, against War Risks only, in accordance with the terms and conditions hereinafter set forth.

To apply to shipments made on or after January 1, 2004.

The Assurer shall not be liable hereunder for more than $2,000,000 per any one vessel / aircraft.

In cases where the total value(s) at risk on any one vessel exceed(s) the limit of liability as set forth in this Policy, the Assured agrees, nevertheless, to report to the Assurer full value(s) at risk and to pay premium thereon at the agreed rates. The Assured further agrees that acceptance of such reports and premium by the Assurer shall not serve to revoke or to overrule the limit of liability set forth in this Policy; however, subject to the limit of liability, the Assurer in accepting these reports does agree to pay partial losses covered by this Policy without reduction by reason of any coinsurance which otherwise may have existed in the absence of this special agreement.

Subject to the provisions of Clause 4 of this Policy, should there be an accumulation of interests exceeding the above limit of liability by reason of any interruption of transit beyond the control of the Assured or by reason of any casualty, and/or after the interests have been discharged from the incoming overseas Vessel at an intermediate port or place for on-carriage from that or any other port or place by another overseas Vessel, and/or on the on-carrying overseas Vessel, this Policy shall attach for the full amount at risk (but in no event for more than twice the Policy limit which would be applicable to any one vessel) provided written notice be given to this Assurer as soon as known to the Assured.

This Policy shall cover only those shipments which are insured against marine risks under Policy No. OC 24-4422 of the Continental Insurance Company it being agreed that the description of such shipments, the valuations thereof, the voyage, the designation of the overseas vessel (which shall be construed to include aircraft if included under the marine policy) on which the goods are to be carried and the ports and/or places of loading and discharge, as reported under the said Policy against marine risks shall be deemed incorporated herein. Notwithstanding the foregoing, this policy shall not cover purely domestic shipments by air between points in the United States of America (excluding Alaska and Hawaii).

Any loss payable hereunder shall be payable in funds current in the United States, to the order of the Assured thirty days after full proofs of loss and proofs of interest have been filed with the Assurer.

Case 3:11-cv-00370   Document 1-1   Filed 04/19/11   Page 60 of 102 PageID #: 69

1.  (a)  This insurance is only against the risks of capture, seizure, destruction or damage by men-of-war, piracy, takings at sea, arrests, restraints, detainments and other warlike operations and acts of kings, princes and peoples in prosecution of hostilities or in the application of sanctions under international agreements, whether before or after declaration of war and whether by a belligerent or otherwise, including factions engaged in civil war, revolution, rebellion or insurrection, or civil strife arising therefrom; the imposition of martial law, military or usurped power, and including the risks of aerial bombardment, floating or stationary mines and stray or derelict torpedoes. Warranted not to abandon (on any ground other than physical damage to ship or cargo) until after condemnation of the property insured.

(b)  This insurance also covers, but only while the property insured is on board a waterborne conveyance, loss of or damage to said property directly caused by governmental authorities acting for the public welfare to prevent or mitigate a pollution hazard or threat thereof, provided that the accident or occurrence creating the situation which required such governmental action would have resulted in a recoverable claim under this Policy (subject to all of its terms, conditions and warranties) if the property insured would have sustained physical loss or damage as a direct result of such accident or occurrence.

2.  Warranted free from any claim based upon loss of, or frustration of, the insured voyage or adventure caused by arrests, restraints or detainments.

3.  This insurance does not cover any loss, damage or expense directly or indirectly arising from, contributed to, or caused by any of the following, whether due to a peril insured against or otherwise:

(a)  commandeering, preemption, requisition or nationalization by the government defacto or otherwise) of the country to or from which the goods are insured.

(b)  Seizure or destruction under quarantine, environmental or customs regulations.

(c)  Delay, deterioration and/or loss of market.

(d)  Nuclear reaction, radiation or radioactive contamination, regardless of how it was caused.

4.  (a)  The insurance against the risks enumerated in clause 1, except the risks of floating or stationary mines and stray or derelict torpedoes, floating or submerged referred to in (b) below, shall not attach to the interest hereby insured or to any part thereof:

(i) prior to being on board an overseas Vessel (For the purpose of this Clause 4 an overseas Vessel shall be deemed to mean a Vessel carrying the interest from one port or place to another where such voyage involves a sea passage by that Vessel);

Case 3:11-cv-00370   Document 1-1   Filed 04/19/11   Page 61 of 102 PageID #: 70

(ii)after being discharged overside from an overseas Vessel at the intended port or place of discharge,

or

after the expiry of 15 days from midnight of the day of arrival of the overseas Vessel at the intended port or place of discharge, whichever shall first occur;

(iii) after expiry of 15 days from midnight of the day of arrival of the overseas vessel at an intermediate port or place to discharge the interest for on-carriage from that or any other port or place by another overseas Vessel, but shall reattach as the interest is loaded on the on-carrying overseas Vessel. During the said period of 15 days the insurance remains in force whether the interest is awaiting transit or in transit between the overseas Vessels.

(iv)For the purpose of this Clause 4 arrival at the intended port of place of discharge shall be deemed to mean that time when the overseas Vessel first berths, anchors, moors or is secured in an area subject to regulation by the authorities of such port or place.

(b)     The insurance against the risks of floating or stationary mines and stray or derelict torpedoes, floating or submerged, attaches as the interest hereby insured is first loaded on a lighter, craft or vessel after leaving the warehouse at point of shipment in transit for the destination declared hereunder, and ceases to attach as the interest is finally landed from the vessel, craft or lighter prior to delivery to warehouse at such destination.

(c)     If the contract of affreightment is terminated at a port or place other than the destination named therein such port or place shall be deemed the intended port or place of discharge for the purpose of this Clause 4.

(d)     Shipments by mail, if covered by this Policy are insured continuously from the time of leaving the sender's premises until delivered to the place of address.

(e)     Shipments by air (other than by air mail) if covered by this Policy are insured subject to the same terms and conditions as shipments by overseas Vessel.

(f)     It is a condition of this is insurance that the Assured shall act with reasonable dispatch in all circumstances within their control.

(g)     If anything contained in this Policy shall be inconsistent with this Clause 4 it shall to the extent of such inconsistency be null and void.

5.     This insurance shall not be vitiated by deviation, overcarriage, change of voyage, or by any error or unintentional omission in the description of interest, vessel or voyage provided the same be communicated to the Assurer as soon as known to the Assured an additional premium paid if required.

Case 3:11-cv-00370   Document 1-1   Filed 04/19/11   Page 62 of 102 PageID #: 71

6.     And in the case of any loss or misfortune, it shall be lawful and necessary to and for the assured his or their factors, servants and assigns, sue, labor and travel for, in and about the defense, safeguard and recovery of the said goods, and merchandises, or any part thereof, without prejudice to this insurance; nor shall the acts of the Assured or Assurers, in recovering, saving and preserving the property insured, in case of disaster, be considered a waiver or an acceptance of an abandonment; and to the charges whereof, the said Assurers will contribute according to the rate and quantity of the sum hereby insured.

7.     General Average and Salvage Charges payable according to United States laws and/or as per Foreign Statement and/or as per York-Antwerp Rules (as prescribed in whole or in part) if in accordance with the Contract of Affreightment.

8.     It is agreed that the reports of shipments made under the Policy against marine risks mentioned above shall be deemed to be reports under this Policy also, and the Assured agrees to pay premium on all shipments insured under this Policy at the war risk rates of the Assurer as fixed from time to time.

9.     No claim shall be payable hereunder which arises from collision, contact with any fixed or floating object (other than a mine or torpedo), stranding, heavy weather or fire unless caused directly (and independently of the nature of the voyage or service which the Vessel concerned or, in the case of a collision, any other Vessel involved therein, is performing) by a hostile act by or against a belligerent power; and for the purpose of this paragraph "power" includes any authority maintaining naval, military or air forces in association with a power.

10.     No recovery for a Constructive Total Loss shall be had hereunder unless the property insured is reasonably abandoned on account of its actual total loss appearing to be unavoidable, or because it cannot be preserved from actual total loss without an expenditure which would exceed its value if the expenditure had been incurred.

11.     It is agreed that this Policy is a separate and wholly independent contract and is not subject to any terms or conditions of the Policy against marine risks above mentioned (whether physically attached thereto or not) except as such terms or conditions shall have been expressly incorporated herein by reference.

12.     This insurance may be cancelled by either party upon forty-eight hours written, telegraphic or telefaxed notice to the other party, but such cancellation shall not affect any shipment on which this insurance has attached under the terms of Clause 4 hereof prior to the effective date of such notice.  Shipments on which this insurance has not so attached but for which, prior to the effective date of such notice, bills of lading have been issued and negotiated, shall be covered from the time of loading on the overseas Vessel, as provided in Clause 4, at the rates of the Assurer, provided that, prior to said effective date, such shipments were at the risk of the Assured and were covered under the said Policy against marine risks.

In the event of loss which may give rise to a claim under this Policy, prompt notice shall be given to this Company.

Any provisions required by law to be stated in policies issued by this Assurer shall be deemed to have been stated herein.

In the event that this policy is subscribed to by several Assurers, it is agreed that, upon request the Assurers will issue separate policies covering their subscription.

In WITNESS WHEREOF, this Assurer has executed these presents at New York, New York, this 1st day of January 2004.

Policy Number WOC 24-4422 of the Continental Insurance Company

CONTINENTAL INSURANCE COMPANY

AUTHORIZED SIGNATURE

12 Feb 04

Case 3:11-cv-00370   Document 1-1   Filed 04/19/11   Page 64 of 102 PageID #: 73

To be attached to and form a part of Policy No. <u>oc 24-4422</u> of <u>The Continental Insurance Company</u>

Insuring <u>Gibson Guitar Corporation</u>

### S.R. & C. C. Endorsement (Form No. 11)

THIS INSURANCE ALSO COVERS:

(1) Physical loss of or damage to property insured directly caused by strikers, locked-out workmen, or persons taking part in labor disturbances or riots or civil commotions;

(2) Physical loss of or damage to the property insured directly caused by vandalism, sabotage or malicious acts; and,

(3) Physical loss of or damage to the property insured directly caused by the act or acts of one or more persons, whether or not agents of a sovereign power, carried out for political, terroristic or ideological purposes and whether any loss, damage or expense resulting therefrom is accidental or intentional; PROVIDED that any claim to be recoverable under this subsection (3) be not excluded by the F.C. & S. Warranty in the Policy to which this endorsement is attached. Notwithstanding the foregoing, coverage under this subsection (3) is conditional upon the property insured being in the ordinary course of transit and, in any event, shall terminate:

    (a) As per the Warehouse to Warehouse Clause, Marine Extension Clause, 60 Day South American Clause and any other clauses relating to duration of transit contained in or endorsed onto the Policy; or,

    (b) on delivery to the consignee's or other final warehouse or place of storage at the destination named herein; or,

    (c) on delivery to any warehouse or place of storage, whether prior to or at the destination named herein, which the Assured elects to use either for storage other than in the ordinary course of transit or for allocation or distribution; or,

    (d) in respect of marine transits, on the expiry of 60 days after completion of discharge overside of the property insured from the vessel at the port of discharge; or,

    (e) in respect of air transits, on the expiry of 30 days after unloading the property insured from the aircraft at the place of discharge;

whichever shall first occur.

While the property insured is at risk under the terms and conditions of this insurance within the United States of America, the Commonwealth of Puerto Rico, the U.S. Virgin Islands and Canada, this insurance is extended to cover physical loss of or damage to the property insured directly caused by acts committed by an agent of any government, party or faction engaged in war, hostilities or other warlike operations, provided such agent is acting secretly and not in connection with any operation of military or naval armed forces in the country where the described property is situated.

Nothing in this endorsement shall be construed to cover any loss, damage or expense directly or indirectly arising from, contributed to or caused by any of the following, whether due to a peril insured against or otherwise:

    (a) change in temperature or humidity;

    (b) the absence, shortage, or withholding of power, fuel, or labor of any description whatsoever during any strike, lockout, labor disturbance, riot or civil commotion;

    (c) loss of market or loss, damage or deterioration arising from delay;

    (d) hostilities, warlike operations, civil war, revolution, rebellion or insurrection, or civil strife arising therefrom, except to the limited extent that the acts of certain agents acting secretly have been expressly covered above; or,

    (e) nuclear reaction, radiation or radioactive contamination.

The Assured agrees to report all shipments attaching under this cover and to pay premiums therefore at the rates established by the Assurer from time to time.

This endorsement may be canceled by either party upon forty-eight hours written, telegraphic or telefaxed notice to the other party, but such cancellation shall not affect any risks which have already attached hereunder.

Effective with respect to shipments made on or after <u>January 1, 2004.</u>

All other terms and conditions remain unchanged.

Dated: <u>May 7, 2004</u>

                               THE CONTINENTAL INSURANCE CO.

**Attached to and forming part of Policy No. OC-244422**

**Of the:**      Continental Insurance Company

**Issued to:**   Gibson Guitar Corporation

**Date:**        January 1, 2004

## WAREHOUSE ENDORSEMENT:

It is understood and agreed that this policy is extended, subject to all terms and conditions, to cover goods and/or merchandise incidental to the business of assured while such goods and/or merchandise are at a storage facility.

Subject to a deductible of $25,000 per occurrence.

Valuation for goods/merchandise in storage/processing at distribution centers and/or warehouses:

> The goods and/or merchandise and/or property insured under this policy while in storage at distribution centers shall be valued at the Assured's selling price.

This extension of coverage shall not attach for more than:

| Name and Address: | Limit of Liability: |
|---|---|
| Any one scheduled location on file with the underwriters: | $10,000,000 |
| Any one unscheduled location: | $ 1,000,000 |

Notwithstanding anything to the contrary contained elsewhere herein, and in addition to other exclusions contained in this policy, this policy shall not pay for loss of or damage to goods and/or merchandise while covered under this endorsement caused by or resulting from:

1. Processing or Manufacturing of the property insured.
2. Unexplained or mysterious disappearance, or loss or shortage disclosed upon taking inventory where there is no evidence that the loss was occasioned by perils specifically insured against.

3.    Misappropriation, secretion, conversion, infidelity or any dishonest act done by or at the instigation of the Assured or his employees or agents or any contractor or sub-contractor and their employees.

In the event of cancellation of the Open Policy of which this extension of coverage is a part, the liability under this extension of coverage shall terminate upon the date of such cancellation and pro rata premium shall be payable by the Assured. In the event of cancellation of the extension of coverage, the open Policy remaining in full force and effect the liability hereunder shall terminate five (5) days after written notice to either the Assured or the Assurers, and pro rata premium shall be payable by the Assured.

**All other terms and conditions remain unchanged**

CONTINENTAL INSURANCE COMPANY

27 Feb. 04



Endorsement No. 2                                                Date of Issuance: 2/17/2004

THIS ENDORSEMENT, EFFECTIVE January 1, 2004 FORMS A PART OF POLICY NO. OC-24-4422
OF THE Continental Insurance Company ISSUED TO Gibson Guitar Corporation

## AIMU U.S. ECONOMIC AND TRADE SANCTIONS CLAUSE

Whenever coverage provided by this policy would be in violation of any U.S. economic or trade
sanctions such as, but not limited to, those sanctions administered and enforced by the U.S.
Treasury Department's Office of Foreign Assets Control ("OFAC"), such coverage shall be null
and void.

Similarly, any coverage relating to or referred to in any certificates or other evidences of
insurance or any claim that would be in violation of U.S. economic or trade sanctions as
described above shall also be null and void.

THE CONTINENTAL INSURANCE CO.

ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.

AGENT OR BROKER NAME AND ADDRESS

WILLIS OF NEW YORK, INC.
7 HANOVER SQUARE
NEW YORK, NY 10004-2594



**AIMU**
**EXTENDED RADIOACTIVE CONTAMINATION EXCLUSION CLAUSE WITH U.S.A. ENDORSEMENT, AND CHEMICAL, BIOLOGICAL, ETC. EXCLUSION CLAUSE**

Endorsement No. <u>1</u>                         Date of Issuance: <u>February 17, 2004</u>

THIS ENDORSEMENT, EFFECTIVE (select one):   ☐ _____,
                                             ☒ with respect to shipments made on and after
                                                <u>January 1, 2004,</u>

FORMS A PART OF POLICY NO. <u>OC 24-4422</u> OF The <u>Continental Insurance Company</u>

ISSUED TO <u>Gibson Guitar Corporation</u>

**AIMU EXTENDED RADIOACTIVE CONTAMINATION EXCLUSION CLAUSE**
**(March 1, 2003)**

This clause shall be paramount and shall override anything contained in this insurance inconsistent therewith.

1.      In no case shall this insurance cover loss, damage, liability or expense directly or indirectly caused by or contributed to by or arising from

    1.1      Ionizing radiations from or contamination by radioactivity from any nuclear fuel or from any nuclear waste or from the combustion of nuclear fuel

    1.2      the radioactive, toxic, explosive or other hazardous or contaminating properties of any nuclear installation, reactor or other nuclear assembly or nuclear component thereof

    1.3      any weapon or device employing atomic or nuclear fission and/or fusion or other like reaction or radioactive force or matter

    1.4      the radioactive, toxic, explosive or other hazardous or contaminating properties of any radioactive matter. The exclusion in this sub-clause does not extend to radioactive isotopes, other than nuclear fuel, when such isotopes are being prepared, carried, stored, or used for commercial, agricultural, medical, scientific or other similar peaceful purposes.

**RADIOACTIVE CONTAMINATION EXCLUSION CLAUSE**
**(U.S.A. ENDORSEMENT)**

This insurance is subject to the Extended Radioactive Contamination Exclusion Clause (March 1, 2003) provided that

if fire is an insured peril

and

where the subject matter insured or, in the case of a reinsurance, the subject matter insured by the original insurance, is within the U.S.A., its islands, onshore territories or possessions

and

a fire arises directly or indirectly from one or more of the causes detailed in Sub-Clauses 1.1, 1.2, and 1.4 of the Extended Radioactive Contamination Exclusion Clause March 1, 2003 any loss or damage arising directly from that fire shall, subject to the provisions of this insurance, be covered, EXCLUDING however any loss damage liability or expense caused by nuclear reaction, nuclear radiation, or radioactive contamination arising directly or indirectly from that fire.

                                                                              Continued...

Case 3:11-cv-00370   Document 1-1   Filed 04/19/11   Page 69 of 102 PageID #: 78



**CNA**

AIMU
EXTENDED RADIOACTIVE CONTAMINATION EXCLUSION CLAUSE WITH U.S.A. ENDORSEMENT,
AND CHEMICAL, BIOLOGICAL, ETC. EXCLUSION CLAUSE

Continued...

AIMU CHEMICAL, BIOLOGICAL, BIO-CHEMICAL, AND ELECTROMAGNETIC EXCLUSION CLAUSE
(March 1, 2003)

This clause shall be paramount and shall override anything contained in this insurance inconsistent
therewith.

In no case shall this insurance cover loss, damage, liability or expense directly or indirectly caused by or contributed
to by or arising from an actual or threatened act involving a chemical, biological, bio-chemical or electromagnetic
weapon, device, agent or material when used in an intentionally hostile manner.

ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED

AGENT OR BROKER NAME AND ADDRESS

WILLIS OF NEW YORK, INC.
7 HANOVER SQUARE
NEW YORK, NY 10004-2594

THE CONTINENTAL INSURANCE CO.

Page 2 of 2

Case 3:11-cv-00370 Document 1-1 Filed 04/19/11 Page 70 of 102 PageID #: 79

## SCHEDULE OF RATES

**Effective with respect to shipments made on and after: January 1, 2005**

**Attached to and forming part of Policy Numbers: OC 24-4422, WR 24-4422**

**of the: Continental Insurance Company**

**ASSURED: Gibson Guitar Corporation**

Shipped on metal-hulled, self-propelled vessels which are not over 20 years of age, not less than 1000 net registered tons and which are classed A1 American Record or equivalent by a Member of the International Association of Classification Societies; or vessels over 20 years of age which are approved by this Assurer, and which are not less than 1000 net registered tons and classed as above, but only while operating in their regular trade; but in either case excluding vessels built (a) for services on the Great Lakes; (b) solely for military or naval service; or (c) for carriage of dry bulk or liquid cargoes, and which are more than 15 years of age, unless specifically approved by this company.

And including air carriers.

Vessels excluded or not provided for by the above wording but covered by the terms of the policy are covered at rates to be arranged.

**COVERING:**     Merchandise incidental to the business of the assured as per clause no. 3 of this policy.

Coverage herein is subject to and Minimum Annual Gross Deposit Premium of $150,000, and is based on estimated annual sales for the policy year of $214,196,972. As soon as practicable after anniversary, an adjustment of the Annual Minimum Deposit Premium shall be made based on a rate of .07% on actual annual sales for the policy period.

War, SRCC included in rate above (except countries on application).

There shall be no adjustment for either option unless estimated sales vary by 10% in either direction.

          Areas on application are held covered at rates to be agreed.

**Countersigned at New York, New York**

**This 1ˢᵗ day of January 1, 2005.**

CONTINENTAL INSURANCE COMPANY

*[signature]*

—————————————————————
**Authorized Representative**

**Endorsement No. 3**

**Attached to and forming part of Policy No. OC-244422**

*Of the:*    Continental Insurance Company

*Issued to:*    Gibson Guitar Corporation

*Date:*    January 1, 2005

**Cargo ISM Endorsement**

In no case shall this insurance cover damage or expense where the Insured property is carried by a vessel that is not ISM code certified or whose owners or operators do not hold ISM Code Document of Compliance when at the time of loading of the Insured Property on board the vessel the Insured's traffic manager was aware.

    a)    either that such vessel was not certified in accordance with the ISM code
    b)    or that a current Document of Compliance was not held by her owner(s) or operator(s)

As required under the SOLAS Convention 1974 as amended.

This exclusion shall not apply where this insurance has been assigned to the party claiming hereunder who has bought or agreed to buy the interest insured in good faith under a binding contract.

**ISM Cargo Expenses Cause**

This insurance is also to indemnify the Insured in respect of any extra expenses that the Insured incurs by way of but not limited to costs of unloading, storing and forwarding the subject matter insured to the destination to which it is insured hereunder or to a substitute destination or until returned to the point of shipment all at the Insured's election where such extra expenses arise out of the carrying vessel being impounded or diverted or otherwise being prevented from starting or completing the insured voyage due to:

    a)    the vessel not being certified in accordance with the ISM Code

    or

    b)    the owner(s) or operator(s) of the vessel not being in possession of a Document of Compliance as required under the SOLAS Convention 1974 as amended.

This clause, which does not apply to General Average or Salvage or Salvage Charges, is subject to all other terms, conditions, and exclusions contained in the insurance

CONTINENTAL INSURANCE COMPANY

**All other terms and conditions remain unchanged**    *P. Bonner & Co*



Endorsement No. 3

Date of Issuance: 1/13/2005

THIS ENDORSEMENT, EFFECTIVE January 1, 2005 FORMS A PART OF POLICY NO. OC 24-4422 OF THE Continental Insurance Company ISSUED TO Gibson Guitar Corporation

## EXCLUSION OF CERTIFIED ACTS OF TERRORISM
## UNDER THE TERRORISM RISK INSURANCE ACT OF NOVEMBER 2002

It is agreed as follows:

The policyholder has been previously notified of the availability of and the price for coverage of **Certified Acts of Terrorism** under the Federal Terrorism Risk Insurance Act of 2002. The Policyholder has opted to not purchase such coverage under its policy.

Any exclusions contained in this policy that apply to acts of terrorism have full force and effect.

As used in this endorsement, **Certified Acts of Terrorism** means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the Federal Terrorism Risk Insurance Act of 2002.

The Federal Terrorism Risk Insurance Act of 2002 sets forth the following criteria for a **Certified Acts of Terrorism**:

a. The act resulted in aggregate losses in excess of $5 million; and

b. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals acting on behalf of any foreign person or foreign interest, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

THE CONTINENTAL INSURANCE CO.

All other provision of this policy remain unchanged.

AGENT OR BROKER NAME AND ADDRESS

WILLIS, INC.
7 HANOVER SQUARE
NEW YORK, NY 10004-2594



Endorsement No. 4                                   Date of Issuance: 1/13/2005

THIS ENDORSEMENT, EFFECTIVE January 10, 2005 FORMS A PART OF POLICY NO. OC 24-4422
OF THE  Continental Insurance Company ISSUED TO  Gibson Guitar Corporation

It is understood and agreed that the following location is hereby added to the Warehouse
Endorsement attached to the captioned policy:

1150 Antioch Pike
Suite 400B
Nashville, TN  37211

Limit of Liability:  $1,750,000

THE CONTINENTAL INSURANCE CO.

ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.

AGENT OR BROKER NAME AND ADDRESS

WILLIS, INC.
7 HANOVER SQUARE
NEW YORK, NY  10004-2594

Endorsement No. 6

Attached to and forming part of Policy No.: OC 24 4422

Of the: Continental Insurance Company

Issued to: Gibson Guitar

Date: August 8, 2005

## LOSS PAYEE ENDORSEMENT

| | |
|---|---|
| First Priority Lienholder: | Bank of America, N.A., as agent, together with its successors and assigns in such capacity, as their interests may appear |
| | 300 Galleria Parkway, Suite 800<br>Atlanta, Georgia 30303<br>Attention: Southeast Loan Administration |
| Second Priority Lienholder: | American Capital Financial Services, Inc., as agent, together with its successors and assigns in such capacity, as their interests may appear |
| | 2 Bethesda Metro Center, 14th Floor<br>Bethesda, Maryland 20814<br>Attention: Compliance Officer |

Lenders Loss Payable

1. The loss payee shown above is a creditor, including a mortgage holder or trustee, whose interest in covered property is established by such written instruments as:

   A) Warehouse receipts;

   B) A contract for deed;

   C) Bills of lading;

   D) Financing statements; or

   E) Mortgages, deeds of trust, or security agreements

2. For covered property in which both the Assured and a loss payee have an insurable interest:

   A) This Assurer will pay for covered loss or damage to each loss payee in their order of precedence, as interests may appear.

   B) The loss payee has the right to receive loss payment even if the loss payee has started foreclosure or similar action on the covered property.

   C) If this Assurer denies the Assured's claim because of the Assured's acts or because the Assured has failed to comply with the terms of the Coverage Part, the loss payee will still have the right to receive loss payment if the loss payee:

Page 1 of 2

Case 3:11-cv-00370   Document 1-1   Filed 04/19/11   Page 75 of 102 PageID #: 84

    i.  Pays any premium due under this coverage part at Assurers request if the Assured has failed to do so;

    ii.  Submits a signed, sworn proof of loss within 60 days after receiving notice from this Assurer of the Assured's failure to do so; and

    iii.  Has notified this Assurer of any change in ownership, occupancy or substantial change in risk known to the loss payee

        All of the terms of this Coverage Part will then apply directly to the loss payee.

D)  If this Assurer pays the Loss Payee for any loss or damage and denies payment to the Assured's because of the Assured's acts or because the Assured has failed to comply with the terms of the Coverage Part:

    i.  The Loss Payee's rights will be transferred to this Assurer to the extent of the amount this Assurer pays; and

    ii.  The Loss Payees rights to recover the full amount of the Loss Payees claim will not be impaired

        At Assurer's option they may pay to the

        Loss Payee the whole principal on the debt plus any accrued interest. In this event, assured will pay their remaining debt to this Assurer

3. If this Assurer cancels this policy, they will give written notice to the Loss Payee at least:

    A)  10 days before the effective date of cancellation if this Assurer cancels for non-payment of premium; or

    B)  30 days before the effective date of cancellation if this assured cancels for any other reason

4. If this Assurer elects not to renew this policy, this Assurer will give written notice to the Loss Payee at least 10 days before the expiration date of this policy.

**ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED**

CONTINENTAL INSURANCE COMPANY

Case 3:11-cv-00370   Document 1-1   Filed 04/19/11   Page 76 of 102 PageID #: 85

## SCHEDULE OF MARINE RATES

**Effective with respect to shipments made on and after:** January 1, 2006

**Attached to and forming part of Policy Number:** OC 24-4422

**of the:** Continental Insurance Company

**ASSURED: Gibson Guitar Corporation**

Shipped on metal-hulled, self-propelled vessels which are not over 20 years of age, not less than 1000 net registered tons and which are classed A1 American Record or equivalent by a Member of the International Association of Classification Societies; or vessels over 20 years of age which are approved by this Assurer, and which are not less than 1000 net registered tons and classed as above, but only while operating in their regular trade; but in either case excluding vessels built (a) for services on the Great Lakes; (b) solely for military or naval service; or (c) for carriage of dry bulk or liquid cargoes, and which are more than 15 years of age, unless specifically approved by this company.

And including air carriers.

Vessels excluded or not provided for by the above wording but covered by the terms of the policy are covered at rates to be arranged.

**COVERING:**     Merchandise incidental to the business of the assured as per clause no. 3 of this policy.

Coverage herein is subject to an Minimum Annual Deposit Premium of $145,000 adjusted on estimated net sales of $227,447,474 against a rate of .0638%

There shall be no adjustment for either option unless estimated sales vary by 10% in either direction.

Areas on application are held covered at rates to be agreed.

Countersigned at New York, New York

This 1st day of January 1, 2006.

_Authorized Representative_



**ENDORSEMENT NO. 4**                                  Date of Issuance: 01/11/2007

THIS ENDORSEMENT, EFFECTIVE **01/01/2007** FORMS A PART OF POLICY NO. **OC 244422** OF THE **Continental Insurance Company** ISSUED TO **Gibson Guitar Corporation**

### EXCLUSION OF CERTIFIED ACTS OF TERRORISM
### UNDER THE TERRORISM RISK INSURANCE ACT, AS EXTENDED

It is agreed as follows:

The Policyholder has been previously notified of the availability of and the price for coverage of **Certified Acts of Terrorism** under the Federal Terrorism Risk Insurance Act of 2002 ("TRIA"). TRIA was scheduled to terminate on December 31, 2005, but was extended through December 31, 2007 by the Terrorism Risk Insurance Extension Act of 2005 ("TRIEA"). The Policyholder has opted to purchase such coverage under this policy.

Any exclusions contained in this policy that apply to acts of terrorism have full force and effect.

As used in this endorsement, TRIEA applies when the Secretary of the Treasury certifies that any event meets the definition of **Certified Acts of Terrorism**. TRIEA provides that, to be certified, an act of terrorism must cause losses of at least $5,000,000 and must have been committed by an individual or individuals acting on behalf of any foreign person or foreign interest to coerce the government or population of the United States.

DISCLOSURE OF FEDERAL PARTICIPATION IN PAYMENT OF TERRORISM LOSSES
The United States Department of the Treasury will pay a share of terrorism losses insured under the federal program. The federal share equals 90% of that portion of the amount of such insured losses that exceeds the applicable insurer retention for Program Year 4 (January 1 – December 31, 2006) and 85% in Program Year 5 (January 1 – December 31, 2007).

All other provisions of the Policy remain unchanged and in full force and effect.

THE CONTINENTAL INSURANCE CO.

TRIA MARINE R1 (ed. 3/06)

Attached to and forming part of Policy No.: OC 24-4422

Of the: Continental Insurance Company

Issued to: Gibson Guitar Corporation

Date: September 19, 2007

## LIMITS OF LIABILITY

It is hereby understood and agreed that effective from September 19, 2007 the Limits of Liability Clause (Clause No. 9) is amended to read as follows:

Unless otherwise agreed This Assurer shall not be liable under this policy for more than:

| | |
|---|---|
| $5,000,000 | per any one conveyance, connecting conveyance, craft or at any place at any time. |
| $500,000 | per anyone vessel subject to an "On Deck" bill of lading |
| $500,000 | per anyone exhibition |
| $50,000 | per any one package via parcel post, messenger service, or courier |

If the total value at risk exceeds the limit of liability provided by this policy, The Assured shall nevertheless report the full amount at risk to This Assurer and shall pay full premium thereon, in consideration of which the principle of co-insurance is waived by This Assurer. Acceptance of such reports and premium by the company shall not alter or increase the limit of liability of This Assurer but This Assurer shall be liable for the full amount of covered loss up to but not exceeding the applicable limit of liability.

This Assurer shall pay in full claims for general average, salvage and special charges and for such expenses as are provided for in the Sue and Labor clause even though the sum insured may be less than the contributing value or actual value of the goods and/or merchandise and/or property insured under this policy.

CONTINENTAL INSURANCE COMPANY

**ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED**

## SCHEDULE OF MARINE RATES

Attached to and forming part of Policy No.: OC 24-4422

Of the: Continental Insurance Company

Issued to: Gibson Guitar Corporation

Date: January 1, 2008

Shipped on metal-hulled, self-propelled vessels which are not over 20 years of age, not less than 1000 net registered tons and which are classed A1 American Record or equivalent by a Member of the International Association of Classification Societies; or vessels over 20 years of age which are approved by this Assurer, and which are not less than 1000 net registered tons and classed as above, but only while operating in their regular trade; but in either case excluding vessels built (a) for services on the Great Lakes; (b) solely for military or naval service; or (c) for carriage of dry bulk or liquid cargoes, and which are more than 15 years of age, unless specifically approved by this company.

And including air carriers.

Vessels excluded or not provided for by the above wording but covered by the terms of the policy are covered at rates to be arranged.

**COVERING:**     Merchandise incidental to the business of the assured as per clause no. 3 of this policy.

Coverage herein is subject to a minimum and annual deposit premium of $154,000 adjusted on net sales (estimated to be $274,000,000) against a rate of .0562%

There shall be no adjustment for either option unless estimated sales vary by 10% in either direction.

Areas on application are held covered at rates to be agreed.

Commission to Willis 10% of above premiums

**Countersigned at New York, NY**
**This 1st day of January, 2008.**

Authorized Representative



ENDORSEMENT NO. 5                                    Date of Issuance: 01/30/2008

THIS ENDORSEMENT, EFFECTIVE 01/01/2008 FORMS A PART OF POLICY NO. OC 244422 OF THE
Continental Insurance Company ISSUED TO Gibson Guitar Corporation

### EXCLUSION OF CERTIFIED ACTS OF TERRORISM
### UNDER THE TERRORISM RISK INSURANCE ACT, AS EXTENDED

It is agreed as follows:

The Policyholder has been previously notified of the availability of and the price for coverage of "Certified
Acts of Terrorism" under the Terrorism Risk Insurance act, as extended and reauthorized ("Act"). As
defined in Section 102(1) of the act, an "act of terrorism" means any act that is certified by the Secretary of
the Treasury – in concurrence with the Secretary of State, and the attorney General of the United States –
to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or
infrastructure; to have resulted in damage within the United States, or outside the United States in the
case of certain air carriers or vessels or the premises of a United States mission; and to have been
committed by an individual or individuals as part of an effort to coerce the civilian population of the United
States or to influence the policy or affect the conduct of the United States Government by coercion.

**The Policyholder has opted to not purchase such coverage under this policy.** Any exclusions
contained in this policy that apply to Certified Acts of Terrorism have full force and effect.

DISCLOSURE OF FEDERAL PARTICIPATION IN PAYMENT OF TERRORISM LOSSES
Under your coverage, any losses resulting from certified acts of terrorism may be partially reimbursed by
the United States Government under a formula established by the Act, as amended.  Under the formula,
the United States Government generally reimburses 85% of covered terrorism losses exceeding the
statutorily established deductible paid by the Insurance Company providing the coverage.  The Act, as
amended, contains a $100 billion cap that limits U.S. Government reimbursement as well as insurers'
liability for losses resulting from certified acts of terrorism when the amount of such losses exceeds $100
billion in any one calendar year.  If the aggregate insured losses for all insurers exceed $100 billion, your
coverage may be reduced.

All other provisions of this policy remain unchanged and in full force and effect.

THE CONTINENTAL INSURANCE CO.

TRIA MARINE R1 (ed. 01/08)

To be attached to and form a part of Policy No. **OC 244422** of The Continental Insurance Company

Insuring **Gibson Guitar Corporation**

### S.R. &C. C. Endorsement (Form No. 12)

THIS INSURANCE ALSO COVERS:

(1) Physical loss of or damage to property insured directly caused by strikers, locked-out workmen, or persons taking part in labor disturbances or riots or civil commotions;

(2) Physical loss of or damage to the property insured directly caused by vandalism, sabotage or malicious acts; and,

(3) Physical loss of or damage to the property insured directly caused by the act or acts of one or more persons, whether or not agents of a sovereign power, carried out for political, terroristic or ideological purposes and whether any loss, damage or expense resulting therefrom is accidental or intentional; PROVIDED that any claim to be recoverable under this subsection (3) be not excluded by the Free of Capture & Seizure Warranty, Extended Radioactive Contamination Exclusion Clause (Extended RACE Clause) or Chemical, Biological, Bio-Chemical and Electromagnetic Exclusion Clause (CBE Clause) in the Policy to which this endorsement is attached. Notwithstanding the foregoing, coverage under this subsection (3) is conditional upon the property insured being in the ordinary course of transit and, in any event, shall terminate:

    (a) As per the Warehouse to Warehouse Clause, Marine Extension Clause, 60 Day South American Clause and any other clauses relating to duration of transit contained in or endorsed onto the Policy; or,

    (b) on delivery to the consignee's or other final warehouse or place of storage at the destination named herein; or,

    (c) on delivery to any warehouse or place of storage whether prior to or at the destination named herein, which the Assured elects to use either for storage other than in the ordinary course of transit or for allocation or distribution; or,

    (d) in respect of marine transits, on the expiry of 60 days after completion of discharge overside of the property insured from the vessel at the port of discharge; or,

    (e) in respect of air transits, on the expiry of 30 days after unloading the property insured from the aircraft at the place of discharge;

whichever shall first occur.

While the property insured is at risk under the terms and conditions of this insurance within the United States of America, the Commonwealth of Puerto Rico, the U.S. Virgin Islands and Canada, this insurance is extended to cover physical loss of or damage to the property insured directly caused by acts committed by an agent of any government, party or faction engaged in war, hostilities or other warlike operations, provided such agent is acting secretly and not in connection with any operation of military or naval armed forces in the country where the described property is situated.

Nothing in this endorsement shall be construed to cover any loss, damage or expense directly or indirectly arising from, contributed to or caused by any of the following, whether due to a peril insured against or otherwise:

(a) change in temperature or humidity;
(b) the absence, shortage, or withholding of power, fuel, or labor of any description whatsoever during any strike, lockout, labor disturbance, riot or civil commotion;
(c) loss of market or loss, damage or deterioration arising from delay;
(d) hostilities, warlike operations, civil war, revolution, rebellion or insurrection, or civil strife arising therefrom, except to the limited extent that the acts of certain agents acting secretly have been expressly covered above; or,
(e) nuclear reaction, radiation or radioactive contamination, as per Extended RACE Clause;
(f) chemical, biological, bio-chemical or electromagnetic weapon, device, agent or material, as per CBE Clause.

The Assured agrees to report all shipments attaching under this cover and to pay premiums therefore at the rates established by the Assurer from time to time.

This endorsement may be canceled by either party upon forty-eight hours written, telegraphic, telefaxed, or electronic notice to the other party, but such cancellation shall not affect any risks which have already attached hereunder.

Effective with respect to shipments made on or after **January 1, 2008**.

THE CONTINENTAL INSURANCE CO.

Attached to and forming part of Policy Number: OC 24-4422

Of the: Continental Insurance Company

Assured: Gibson Guitar Corporation

Date: October 15, 2008

<u>New Mailing Address</u>

It is hereby understood and agreed that the mailing address for Gibson Guitar Corporation is amended to the following:

Gibson Guitar Corporation
309 Plus Park Blvd.
Nashville, TN 37217

ALL OTHER TERMS AND CONDITIONS TO REMAIN UNCHANGED

THE CONTINENTAL INSURANCE CO.

Authorized Representative

Willis

Effective with respect to shipments made on and after: January 1, 2009

Attached to and forming part of Policy Number: OC 24-4422 of the Continental Insurance Company

**ASSURED: Gibson Guitar Corporation**

## VALUATION ENDORSEMENT

It is hereby understood and agreed that Clause 8 of the attached policy is rewritten to read as follows:

Unless specifically provided for elsewhere in this policy, or instructions to the contrary are given or received by The Assured, the goods and/or merchandise and/or property insured under this policy shall be valued as follows:

Stock in Process:

The value of raw materials and labor expended plus the proper proportion of overhead charges

Finished Goods Manufactured by The Assured:

The regular cash selling price at the location where the loss happens, less all discounts and charges to which the finished goods would have been subject had no loss happened.

Raw Materials, Supplies and Other Merchandise
Not Manufactured by The Assured:

If repaired or replaced, the actual expenditure incurred in repairing or replacing the damaged or destroyed property or if not repaired or replaced, the Actual Cash Value.

Privilege is granted to The Assured to insure in foreign currencies. When the privilege is exercised, the proceeds paid under this policy are payable in the same currencies, otherwise the proceeds are payable in United States dollars at the rate of exchange current on the date the invoice for the damaged or lost goods was issued as published in the Dow Jones Foreign Exchange Rates.

Insured goods and/ or merchandise and/or property shipped free of charge, or for an amount not reflective of their actual value, to or from The Assured shall be valued at replacement cost new, whether or not actually replaced.

Used goods and/ or merchandise and/or property shall be valued at replacement value with like kind and quality, if unable to be replaced with like kind and quality then at actual cash value.

In the event The Assured receives written instructions for goods and/or merchandise and/or property to be valued on a basis differing from the above, then the goods and/or merchandise and/or property are to be valued in accordance with such instructions.

**ALL OTHER TERMS AND CONDITIONS TO REMAIN UNCHANGED**

Authorized Representative

Willis

Effective with respect to shipments made on and after: January 1, 2009

Attached to and forming part of Policy Number: OC 24-4422 of the Continental Insurance Company

ASSURED: Gibson Guitar Corporation

## DEPOSIT PREMIUM

Policy Period: January 1, 2009 to January 1, 2010

As consideration for this policy, The Assured shall pay this Company an adjustable deposit premium of $205,000.00, subject to a minimum annual premium of $165,000.00, based on Estimated Annual Sales of $401,000,000.00.

The deposit premium will be PAYABLE on the following basis:

    $205,000.00        Payable Upon Receipt

Within 30 days after the end of the above period The Assured shall submit to Willis of Tennessee, Inc., for transmission to this Company, a report of their Actual Annual Sales for premium adjustment. This Company will apply the Actual Annual Sales to the rates shown on the Schedule of Marine Rates for this policy period to determine the earned premium.

Such earned premium shall be compared to the deposit premium of $205,000.00. If the earned premium exceeds the deposit then The Assured shall immediately pay this Company the difference. If the deposit exceeds the earned premium, then this Company shall immediately pay The Assured the difference.

No premium adjustment will be made unless the Actual Annual Sales are in excess of +/- 10% of the Estimated Annual Sales.

A new deposit will be determined for each succeeding year prior to the anniversary date of January 1 of this policy.

Deposit premiums are inclusive of 10% Brokerage Commission.

    ALL OTHER TERMS AND CONDITIONS TO REMAIN UNCHANGED

                             2/25/08

                Authorized Representative

Willis

Effective with respect to shipments made on and after:  January 1, 2009

Attached to and forming part of Policy Number: OC 24-4422 of the Continental Insurance Company

ASSURED:  Gibson Guitar Corporation

## NON-ADMITTED INSURANCE – TAX CLAUSE

In the event of a loss payable under this policy to a foreign subsidiary of The Assured, where it is not permissible to pay the claim in the country of loss, it is agreed that The Assurer will pay The Assured the income tax that The Assured must pay on the recovered claim, limited to 15% of the claim amount.

ALL OTHER TERMS AND CONDITIONS TO REMAIN UNCHANGED

Authorized Representative

Willis

## SCHEDULE OF MARINE RATES

Attached to and forming part of Policy No.: OC 24-4422

Of the: Continental Insurance Company

Issued to: Gibson Guitar Corporation

Effective Date: January 1, 2009

Shipped on metal-hulled, self-propelled vessels which are not over 20 years of age, not less than 1000 net registered tons and which are classed A1 American Record or equivalent by a Member of the International Association of Classification Societies; or vessels over 20 years of age which are approved by This Assurer, and which are not less than 1000 net registered tons and classed as above, but only while operating in their regular trade; but in either case excluding vessels built (a) for services on the Great Lakes; (b) solely for military or naval service; or (c) for carriage of dry bulk or liquid cargoes, and which are more than 15 years of age, unless specifically approved by this company.

And including air carriers.

Vessels excluded or not provided for by the above wording but covered by the terms of the policy are covered at rates to be arranged.

| | |
|---|---|
| COVERING: | Merchandise incidental to the business of The Assured as per clause no. 3 of this policy. |
| RATES: | Marine, War and S.R. & C.C.:      .0512% against the Assured's sales |
| | Areas on application are held covered at rates to be agreed. |

ALL OTHER TERMS AND CONDITIONS TO REMAIN UNCHANGED

2/25/09

Authorized Representative.

Willis

Effective with respect to shipments made on and after: January 1, 2009

Attached to and forming part of Policy Number: OC 24-4422 of the Continental Insurance Company

ASSURED: Gibson Guitar Corporation

### WAREHOUSE ENDORSEMENT

It is understood and agreed that this policy is extended, subject to all terms and conditions, to cover goods and/or merchandise incidental to the business of the Assured while such goods and/or merchandise are at a warehouse and/or storage and/or processing facility.

Subject to a deductible of $25,000 per occurrence.

This extension of coverage shall not attach for more than:

| | Location | Address | City | State | Country | Zip | Limit |
|---|---|---|---|---|---|---|---|
| 1. | Baldwin Piano Plant | 900 Hwy 463 South | Trumann | AR | USA | 72472-9604 | $10,000,000 |
| 2. | Baldwin Wood Plant (subleased) | 748 Hwy 463 South | Trumann | AR | USA | 72472 | $5,000,000 |
| 3. | ER (leased) | 9350 Civic Center Dr Ste 130 | Beverly Hills | CA | USA | 90210 | $5,000,000 |
| 4. | Kenco (Maestro) | 14651 Yorba Ave. | Chino | CA | USA | 91710 | $5,000,000 |
| 5. | ER/Audio (leased) | 709 G Street NW Ste 400 | Washington | DC | USA | 20001 | $5,000,000 |
| 6. | ER (leased) | Buena Vista Bldg. Miami Design District 180 NE 39th St. | Miami | FL | USA | 33137 | $5,000,000 |
| 7. | ER (leased) | 23 East Central Blvd | Orlando | FL | USA | 32801 | $5,000,000 |
| 8. | Gear | 1150 Bowes Rd | Elgin | IL | USA | 60123 | $5,000,000 |
| 9. | Deutsche Wurlitzer GMGH, Inc | 1341 Estes Avenue | Gurnee | IL | USA | 60031 | $5,000,000 |
| 10. | Deutsche Wurlitzer GMGH, Inc | 3909 Grove Street | Gurnee | IL | USA | 60031 | $5,000,000 |
| 11. | Montana | 1894 Orville Way | Bozeman | MT | USA | 59715 | $5,000,000 |
| 12. | ER (leased) | 421 West 54th St 1st floor | New York | NY | USA | 10019 | $5,000,000 |
| 13. | Custom Memphis | 145 Lt. George W. Lee Ave. | Memphis | TN | USA | 38103 | $5,000,000 |
| 14. | Broadway | 318 Broadway | Nashville | TN | USA | 37203 | $5,000,000 |

Willis

| | | | City | State | Country | Zip | Value |
|---|---|---|---|---|---|---|---|
| 16. | Custom | 1612 Elm Hill Pike | Nashville | TN | USA | 37210 | $10,000,000 |
| 17. | Electric | 641 Massman Dr | Nashville | TN | USA | 37210 | $10,000,000 |
| 18. | Electric | 1679 Elm Tree Dr | Nashville | TN | USA | 37210 | $5,000,000 |
| 19. | Electric | 643 Massman Dr | Nashville | TN | USA | 37210 | $5,000,000 |
| 20. | Electric | 653 Massman Dr | Nashville | TN | USA | 37210 | $5,000,000 |
| 21. | Epiphone | 647 & 645 Massman Dr | Nashville | TN | USA | 37210 | $5,000,000 |
| 22. | Epiphone | 657 Massman Dr | Nashville | TN | USA | 37210 | $5,000,000 |
| 23. | Parking Lot | 138 12th Ave. North | Nashville | TN | USA | 37203 | $5,000,000 |
| 24. | Studio | 1102 Grundy St | Nashville | TN | USA | 37203 | $5,000,000 |
| 25. | OMR, OMS, OAI | 161 Opry Mills Dr | Nashville | TN | USA | 37214 | $5,000,000 |
| 26. | Milano | 174-76 3rd Ave N | Nashville | TN | USA | 37201 | $5,000,000 |
| 27. | Repair/ER | 1117 & 1121 Church St | Nashville | TN | USA | 37203 | $5,000,000 |
| 28. | ER (leased) | 3601 S. Congress Ave., Bldg. G | Austin | TX | USA | 78704 | $5,000,000 |
| 29. | Labs (storage) | 850 SW 7th St | Renton | WA | USA | 98055 | $5,000,000 |
| 30. | Labs/ER (leased) | 159 South Jackson St Ste 330 | Seattle | WA | USA | 98104 | $5,000,000 |
| 32. | ER (leased) | 1205 King St. West | Toronto | Ontario | Canada | | $5,000,000 |
| 33. | Qingdao Gibson Musical Instruments Co., Ltd. | Zhangjiatun Village, Puji Town | Jiaozhou City | Shandong | China | P.c: 266325 | $5,000,000 |
| 34. | Gibson Guitar Corporation Qingdao Representati ve Office | KyungKwangHwaWon, CnJoo Load | Jiaozhou City | | China | | $5,000,000 |
| 35. | ER (leased) | 812 Central Yanan Rd | Shanghai | | China | 200041 | $5,000,000 |
| 36. | Gibson China-Shanghai (leased) | 65 Shanxi Road North, Suite 2202 | Shanghai | | China | 200041 | $5,000,000 |

Willis

| | | | | | Country | | |
|---|---|---|---|---|---|---|---|
| 38. | ER (leased) | 28-35 Rathbone Street 3rd Floor | London | | UK | W1T 1NJ | $5,000,000 |
| 39. | ER (leased) | 14 Rue Chaptal | Paris | | France | 75009 | $5,000,000 |
| 40. | ER (leased) | Linienstrasse 148 | Berlin | | Germany | 10115 | $5,000,000 |
| 41. | ER (leased) | 4-30-3 Yoyogi Aragaki Bld. 5F Sendagaya, Shibuya | Tokyo | | Japan | 150-0051 | $5,000,000 |
| 42. | Gibson Europe | Langeweg 49 | Vianen | | Netherlands | 4133 AB | $5,000,000 |
| 43. | Gibson Europe | Carisenhoff 5cd | Vianen | | Netherlands | 4133 AB | $5,000,000 |
| 44. | ER (leased) | Calle Serano 16, 1st Floor | Madrid | | Spain | 28001 | $5,000,000 |
| 45. | Baldwin Dongbei | Bohai Street | Yinkou | Liaolin | China | | $10,000,000 |
| 46. | Fujigen, Inc. Okubo Warehouse | 5652-9, Sasaga | Matsumoto | Nagano | Japan | 399-0033 | $10,000,000 |
| 47. | Access Fulfilment, Ltd | 2 Lady Lane Industrial Estate | Hadleigh | Suffolk | UK | IP7 6BQ | $5,000,000 |
| 48. | Garrison Canada | 44 Clyde Avenue | Mount Pearl | NF | Canada | A1N 4S1 | $5,000,000 |
| 49. | JapanCo, Ltd | 1-8-14, Ginza | Tokyo | | Japan | | $5,000,000 |
| 50. | Deutsche Wurlitzer UK | 13 Moorbrook | Didcot | Oxfordshire | UK | | $5,000,000 |
| 51. | Deutsche Wurlitzer GmbH | Wurlitzstr. 6 | Hullhorst | | Germany | | $10,000,000 |

$1,000,000 per any one unscheduled location

Location 46, Nagano Japan is subject to a $100,000 deductible each occurrence and an annual aggregate limit of $250,000 for the peril of Earthquake.

Location 45, Liaolin China is subject to a $100,000 deductible each occurrence and an annual aggregate limit of $250,000 for the peril of Earthquake.

Willis

Notwithstanding anything to the contrary contained elsewhere herein, and in addition to other exclusions contained in this policy, this policy shall not pay for loss of or damage to goods and/or merchandise while covered under this endorsement caused by or resulting from:

1. Processing or Manufacturing of the property insured.
2. Unexplained or mysterious disappearance, or loss or shortage disclosed upon taking inventory where there is no evidence that the loss was occasioned by perils specifically insured against.
3. Misappropriation, secretion, conversion, infidelity or any dishonest act done by or at the instigation of the Assured or his employees or agents or any contractor or sub-contractor and their employees.

In the event of cancellation of the Open Policy of which this extension coverage is a part, the liability under this extension of coverage shall terminate upon the date of such cancellation and pro rata premium shall be payable by the Assured. In the event of cancellation of the extension of coverage, the open Policy remaining in full force and effect the liability hereunder shall terminate five (5) days after written notice to either the Assured or the Assurers, and pro-rata premium shall be payable by the Assured.

ALL OTHER TERMS AND CONDITIONS TO REMAIN UNCHANGED

_____  2/25/09
Authorized Representative

Willis

To be attached to and form a part of Policy No. <u>OC 244422</u> of The Continental Insurance Company

Insuring <u>Gibson Guitar Corporation</u>

### S.R. &C. C. Endorsement (Form No. 12)

THIS INSURANCE ALSO COVERS:

(1) Physical loss of or damage to property insured directly caused by strikers, locked-out workmen, or persons taking part in labor disturbances or riots or civil commotions;

(2) Physical loss of or damage to the property insured directly caused by vandalism, sabotage or malicious acts; and,

(3) Physical loss of or damage to the property insured directly caused by the act or acts of one or more persons, whether or not agents of a sovereign power, carried out for political, terroristic or ideological purposes and whether any loss, damage or expense resulting therefrom is accidental or intentional; PROVIDED that any claim to be recoverable under this subsection (3) be not excluded by the Free of Capture & Seizure Warranty, Extended Radioactive Contamination Exclusion Clause (Extended RACE Clause) or Chemical, Biological, Bio-Chemical and Electromagnetic Exclusion Clause (CBE Clause) in the Policy to which this endorsement is attached. Notwithstanding the foregoing, coverage under this subsection (3) is conditional upon the property insured being in the ordinary course of transit and, in any event, shall terminate:

    (a) As per the Warehouse to Warehouse Clause, Marine Extension Clause, 60 Day South American Clause and any other clauses relating to duration of transit contained in or endorsed onto the Policy; or,

    (b) on delivery to the consignee's or other final warehouse or place of storage at the destination named herein; or,

    (c) on delivery to any warehouse or place of storage whether prior to or at the destination named herein, which the Assured elects to use either for storage other than in the ordinary course of transit or for allocation or distribution; or,

    (d) in respect of marine transits, on the expiry of 60 days after completion of discharge overside of the property insured from the vessel at the port of discharge; or,

    (e) in respect of air transits, on the expiry of 30 days after unloading the property insured from the aircraft at the place of discharge;

whichever shall first occur.

While the property insured is at risk under the terms and conditions of this insurance within the United States of America, the Commonwealth of Puerto Rico, the U.S. Virgin Islands and Canada, this insurance is extended to cover physical loss of or damage to the property insured directly caused by acts committed by an agent of any government, party or faction engaged in war, hostilities or other warlike operations, provided such agent is acting secretly and not in connection with any operation of military or naval armed forces in the country where the described property is situated.

Nothing in this endorsement shall be construed to cover any loss, damage or expense directly or indirectly arising from, contributed to or caused by any of the following, whether due to a peril insured against or otherwise:

(a) change in temperature or humidity;

(b) the absence, shortage, or withholding of power, fuel, or labor of any description whatsoever during any strike, lockout, labor disturbance, riot or civil commotion;

(c) loss of market or loss, damage or deterioration arising from delay;

(d) hostilities, warlike operations, civil war, revolution, rebellion or insurrection, or civil strife arising therefrom, except to the limited extent that the acts of certain agents acting secretly have been expressly covered above; or,

(e) nuclear reaction, radiation or radioactive contamination, as per Extended RACE Clause;

(f) chemical, biological, bio-chemical or electromagnetic weapon, device, agent or material, as per CBE Clause.

The Assured agrees to report all shipments attaching under this cover and to pay premiums therefore at the rates established by the Assurer from time to time.

This endorsement may be canceled by either party upon forty-eight hours written, telegraphic, telefaxed, or electronic notice to the other party, but such cancellation shall not affect any risks which have already attached hereunder.

Effective with respect to shipments made on or after <u>January 1, 2009</u>.

THE CONTINENTAL INSURANCE CO.



Date of Issuance: 01/20/2009

THIS ENDORSEMENT, EFFECTIVE 01/01/2009 FORMS A PART OF POLICY NO. OC 244422 OF THE
Continental Insurance Company ISSUED TO Gibson Guitar Corporation

### EXCLUSION OF CERTIFIED ACTS OF TERRORISM
### UNDER THE TERRORISM RISK INSURANCE ACT, AS EXTENDED

It is agreed as follows:

The Policyholder has been previously notified of the availability of and the price for coverage of "Certified
Acts of Terrorism" under the Terrorism Risk Insurance act, as extended and reauthorized ("Act"). As
defined in Section 102(1) of the act, an "act of terrorism" means any act that is certified by the Secretary of
the Treasury – in concurrence with the Secretary of State, and the attorney General of the United States –
to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or
infrastructure; to have resulted in damage within the United States, or outside the United States in the
case of certain air carriers or vessels or the premises of a United States mission; and to have been
committed by an individual or individuals as part of an effort to coerce the civilian population of the United
States or to influence the policy or affect the conduct of the United States Government by coercion.

**The Policyholder has opted to not purchase such coverage under this policy.** Any exclusions
contained in this policy that apply to Certified Acts of Terrorism have full force and effect.

DISCLOSURE OF FEDERAL PARTICIPATION IN PAYMENT OF TERRORISM LOSSES
Under your coverage, any losses resulting from certified acts of terrorism may be partially reimbursed by
the United States Government under a formula established by the Act, as amended. Under the formula,
the United States Government generally reimburses 85% of covered terrorism losses exceeding the
statutorily established deductible paid by the Insurance Company providing the coverage. The Act, as
amended, contains a $100 billion cap that limits U.S. Government reimbursement as well as insurers'
liability for losses resulting from certified acts of terrorism when the amount of such losses exceeds $100
billion in any one calendar year. If the aggregate insured losses for all insurers exceed $100 billion, your
coverage may be reduced.

All other provisions of this policy remain unchanged and in full force and effect.

THE CONTINENTAL INSURANCE CO.

TRIA MARINE R1 (ed. 01/08)

Attached to and forming part of Policy Number: OC 24-4422

Of the: Continental Insurance Company

Assured: Gibson Guitar Corporation

Date: October 15, 2008

<u>Changes in Warehouse Locations and Values</u>

It is hereby understood and agreed that effective August 25, 2008 the following changes are made to the warehouse locations:

1. The Deutsche Wurlitzer UK location which was previously listed as being in Suffolk is actually in Didcot/Oxfordshire.

2. Coverage for a new location for Deutsche Wurlitzer GmbH is added at the following address:

   Deutsche Wurlitzer GmbH
   Wurlitzstr. 6
   Hullhorst, Germany 32609

ALL OTHER TERMS AND CONDITIONS TO REMAIN UNCHANGED

THE CONTINENTAL INSURANCE CO.

Authorized Representative

Willis

Endorsement No.    08

Effective with respect to shipments made on and after:    **January 1, 2010**

Attached to and forming part of Policy Number:    OC 24-4422

Of the:    **Continental Insurance Company**

ASSURED:    **Gibson Guitar Corporation**

RECEIVED

JAN 1 2 2010

Willis of Michigan, Inc.
Farmington Hills, MI

## 2010 WAREHOUSE ENDORSEMENT

This endorsement cancels and replaces the previous "WAREHOUSE ENDORSEMENT".

It is understood and agreed that this policy is extended, subject to all terms and conditions, to cover goods and/or merchandise incidental to the business of the Assured while such goods and/or merchandise are at a warehouse and/or storage and/or processing facility.

Subject to a deductible of $25,000 per occurrence.

This extension of coverage shall not attach for more than:

| Division | Address | City | State | Country | Zip | Limit |
|---|---|---|---|---|---|---|
| Baldwin Piano Plant | 900 Hwy 463 South | Trumann | AR | USA | 72472-9604 | $10,000,000 |
| Electric | 641 Massman Dr | Nashville | TN | USA | 37210 | $10,000,000 |
| Baldwin Dongbei | 82 West Bohai Street | Yinkou City | Liaoning | China | | $10,000,000 |
| Deutsche Wurlitzer GmbH | Wurlitzstr. 6 | Hullhorst | | Germany | | $10,000,000 |
| Custom | 1612 Elm Hill Pike | Nashville | TN | USA | 37210 | $10,000,000 |
| Fujigen, Inc. Okubo Warehouse | 5652-9, Sasaga | Matsumoto | Nagano | Japan | 399-0033 | $10,000,000 |
| Epiphone | 647 & 645 Massman Dr | Nashville | TN | USA | 37210 | $10,000,000 |
| Baldwin Wood Plant (subleased) | 748 Hwy 463 South | Trumann | AR | USA | 72472 | $5,000,000 |
| ER (leased) | 9350 Civic Center Dr Ste 130 | Beverly Hills | CA | USA | 90210 | $5,000,000 |
| Kenco(Maestro) | 14651 Yorba Ave. | Chino | CA | USA | 91710 | $5,000,000 |
| ER/Audio (leased) | 709 G Street NW Ste 400 | Washington | DC | USA | 20001 | $5,000,000 |
| ER (leased) | Buena Vista Bldg. Miami Design District 180 NE 39th St. | Miami | FL | USA | 33137 | $5,000,000 |
| ER (leased) | 23 East Central Blvd | Orlando | FL | USA | 32801 | $5,000,000 |

Willis

| Division | Address | City | State | Country | Zip | Limit |
|---|---|---|---|---|---|---|
| Gear | 1150 Bowes Rd | Elgin | IL | USA | 60123 | $5,000,000 |
| Deutsche Wurlitzer GMGH, Inc | 1341 Estes Avenue | Gurnee | IL | USA | 60031 | $5,000,000 |
| Deutsche Wurlitzer GMGH, Inc | 3909 Grove Street | Gurnee | IL | USA | 60031 | $5,000,000 |
| Montana | 1894 Orville Way | Bozeman | MT | USA | 59715 | $5,000,000 |
| ER (leased) | 421 West 54th St 1st floor | New York | NY | USA | 10019 | $5,000,000 |
| Custom Memphis | 145 Lt. George W. Lee Ave. | Memphis | TN | USA | 38103 | $5,000,000 |
| Broadway | 318 Broadway | Nashville | TN | USA | 37203 | $5,000,000 |
| Corporate | 309 Plus Park Blvd | Nashville | TN | USA | 37217 | $5,000,000 |
| Electric | 1879 Elm Tree Dr | Nashville | TN | USA | 37210 | $5,000,000 |
| Electric | 643 Massman Dr | Nashville | TN | USA | 37210 | $5,000,000 |
| Electric | 653 Massman Dr | Nashville | TN | USA | 37210 | $5,000,000 |
| Epiphone | 657 Massman Dr | Nashville | TN | USA | 37210 | $5,000,000 |
| Parking Lot | 138 12th Ave. North | Nashville | TN | USA | 37203 | $5,000,000 |
| Studio | 1102 Grundy St | Nashville | TN | USA | 37203 | $5,000,000 |
| OMR, OMS, OAI | 161 Opry Mills Dr | Nashville | TN | USA | 37214 | $5,000,000 |
| Milano | 174-76 3rd Ave N | Nashville | TN | USA | 37201 | $5,000,000 |
| Repair/ER | 1117 & 1121 Church St | Nashville | TN | USA | 37203 | $5,000,000 |
| ER (leased) | 3601 S. Congress Ave., Bldg. G | Austin | TX | USA | 78704 | $5,000,000 |
| Labs (storage) | 850 SW 7th St | Renton | WA | USA | 98055 | $5,000,000 |
| Labs/ER (leased) | 159 South Jackson St Ste 330 | Seattle | WA | USA | 98104 | $5,000,000 |
| ER (leased) | 1205 King St. West | Toronto | Ontario | Canada | | $5,000,000 |
| Gibson Qingdao Musical Instruments Co., Ltd. | Zhangjiatun Village, Puji Town | Jiaozhou City | Shandong | China | Pc:2663 25 | $5,000,000 |

Willis

| Division | Address | City | State | Country | Zip | Limit |
|---|---|---|---|---|---|---|
| Gibson Guitar Corporation Qingdao Representative Office | KyungKwangHwaWon, OnJoo Load | Jiaozhou City | | China | | $5,000,000 |
| ER (leased) | 812 Central Yenan Rd | Shanghai | | China | 200041 | $5,000,000 |
| Gibson China-Shanghai (leased) | 66 Shanxi Road North, Suite 2202 | Shanghai | | China | 200041 | $5,000,000 |
| Baldwin (Zhongshan) Piano & Musical Instrument Co.,Ltd. | Guanlan Industrial District, Dongsheng Town | Zhongshan, | Guangdong | China | P.C.: 528412 | $5,000,000 |
| ER (leased) | 29-35 Rathbone Street 3rd Floor | London | | UK | W1T 1NJ | $5,000,000 |
| ER (leased) | 14 Rue Chaptal | Paris | | France | 75009 | $5,000,000 |
| ER (leased) | Linienstrasse 148 | Berlin | | Germany | 10115 | $5,000,000 |
| Gibson Europe | Langeweg 49 | Vianen | | Netherlands | 4133 AB | $5,000,000 |
| Gibson Europe | Carlsenhoff 5cd | Vianen | | Netherlands | 4133 AB | $5,000,000 |
| ER (leased) | Calle Serano 16, 1st Floor | Madrid | | Spain | 28001 | $5,000,000 |
| Access Fulfillment, Ltd | 2 Lady Lane Industrial Estate | Hadleigh | Suffolk | UK | IP7 6BQ | $5,000,000 |
| Garrison Canada | 44 Clyde Avenue | Mount Pearl | Newfoundland | Canada | A1N 4S1 | $5,000,000 |
| JapanCo, Ltd | 1-8-14,Ginza | Tokyo | | Japan | | $5,000,000 |
| Deutsche Wurlitzer UK | 13 Moorbrook | Didcot | Oxfordshire | UK | | $5,000,000 |
| Epiphone Qingdao Musical Instruments Co, Ltd. | HeToudian Town, Laixi | Qingdao | Shandong | China | 266609 | $5,000,000 |
| Gibson Shanghai Music Instruments Trading Company | Chunshenjiang Mansion Room 1105, No. 400 Zhejiang Zhong Road | Shanghai | | China | 200002 | $5,000,000 |

$1,000,000 per any one unscheduled location

Location 6, Nagano Japan is subject to a $100,000 deductible each occurrence and an annual aggregate limit of $250,000 for the peril of Earthquake.

Location 3, Liaoning China is subject to a $100,000 deductible each occurrence and an annual aggregate limit of $250,000 for the peril of Earthquake.

Willis

Notwithstanding anything to the contrary contained elsewhere herein, and in addition to other exclusions contained in this policy, this policy shall not pay for loss of or damage to goods and/or merchandise while covered under this endorsement caused by or resulting from:

1. Processing or Manufacturing of the property insured.
2. Unexplained or mysterious disappearance, or loss or shortage disclosed upon taking inventory where there is no evidence that the loss was occasioned by perils specifically insured against.
3. Misappropriation, secretion, conversion, infidelity or any dishonest act done by or at the instigation of the Assured or his employees or agents or any contractor or sub-contractor and their employees.

In the event of cancellation of the Open Policy of which this extension coverage is a part, the liability under this extension of coverage shall terminate upon the date of such cancellation and pro rata premium shall be payable by the Assured. In the event of cancellation of the extension of coverage, the open Policy remaining in full force and effect the liability hereunder shall terminate five (5) days after written notice to either the Assured or the Assurers, and pro-rata premium shall be payable by the Assured.

### ALL OTHER TERMS AND CONDITIONS TO REMAIN UNCHANGED

_Charles H Smith_
_____
**Signature of Assurer or Authorized Representative**

Willis

Endorsement No. 09

Effective with respect to shipments made on and after:  **January 1, 2010**

Attached to and forming part of Policy Number:  **OC 24-4422**

Of the;  **Continental Insurance Company**

ASSURED:  **Gibson Guitar Corporation**

### 2010 SCHEDULE OF MARINE RATES

Shipped on metal-hulled, self-propelled vessels which are not over 20 years of age, not less than 1000 net registered tons and which are classed A1 American Record or equivalent by a Member of the International Association of Classification Societies; or vessels over 20 years of age which are approved by This Assurer, and which are not less than 1000 net registered tons and classed as above, but only while operating in their regular trade; but in either case excluding vessels built (a) for services on the Great Lakes; (b) solely for military or naval service; or (c) for carriage of dry bulk or liquid cargoes, and which are more than 15 years of age, unless specifically approved by this company.

And including air carriers.

Vessels excluded or not provided for by the above wording but covered by the terms of the policy are covered at rates to be arranged.

COVERING:     Merchandise incidental to the business of The Assured as per clause no. 3 of this policy.

RATES:     Marine, War and S.R. & C.C.:     .047% against the Assured's sales

Areas on application are held covered at rates to be agreed.

ALL OTHER TERMS AND CONDITIONS TO REMAIN UNCHANGED

_Charles H. Smith_

Signature of Assurer or Authorized Representative

Willis

Endorsement No.    **10**

Effective with respect to shipments made on and after:    **January 1, 2010**

Attached to and forming part of Policy Number:    **OC 24-4422**

Of the:    **Continental Insurance Company**

ASSURED:    **Gibson Guitar Corporation**

## DEPOSIT PREMIUM

#### Policy Period: January 1, 2010 to January 1, 2011

As consideration for this policy, The Assured shall pay this Company an adjustable deposit premium of **$188,470.00**, subject to a minimum annual premium of **$150,000.00**, based on Estimated Annual Sales of **$401,000,000.00**.

The deposit premium will be PAYABLE on the following basis:

    **$188,470.00**          **Payable Upon Receipt**

Within 30 days after the end of the above period The Assured shall submit to Willis, for transmission to this Company, a report of their **Actual Annual Sales** for premium adjustment.  This Company will apply the **Actual Annual Sales** to the rates shown on the Schedule of Marine Rates for this policy period to determine the earned premium.

Such earned premium shall be compared to the deposit premium of **$188,470.00**.  If the earned premium exceeds the deposit then The Assured shall immediately pay this Company the difference.  If the deposit exceeds the earned premium, then this Company shall immediately pay The Assured the difference.

**No premium adjustment will be made unless the Actual Annual Sales are in excess of +/- 10% of the Estimated Annual Sales.**

A new deposit will be determined for each succeeding year prior to the anniversary date of January 1 of this policy.

**Deposit premiums are inclusive of 10% Brokerage Commission.**

### ALL OTHER TERMS AND CONDITIONS TO REMAIN UNCHANGED

_Charles H Smith_

**Signature of Assurer or Authorized Representative**

**Willis**



ENDORSEMENT NO. 11                           Date of Issuance 01/07/2010

THIS ENDORSEMENT, EFFECTIVE 01/01/2010 FORMS A PART OF POLICY NO. OC 24-4422 OF THE Continental Insurance Company ISSUED TO Gibson Guitar Corp.

### EXCLUSION OF CERTIFIED ACTS OF TERRORISM
### UNDER THE TERRORISM RISK INSURANCE ACT, AS EXTENDED

It is agreed as follows:

The Policyholder has been previously notified of the availability of and the price for coverage of **"Certified Acts of Terrorism"** under the Terrorism Risk Insurance Act, as extended and reauthorized ("Act"). As defined in Section 102(1) of the Act, an "act of terrorism" means any act that is certified by the Secretary of the Treasury - in concurrence with the Secretary of State, and the Attorney General of the United States - to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**The Policyholder has opted to not purchase such coverage under this policy.** Any exclusions contained in this policy that apply to Certified Acts of Terrorism have full force and effect.

DISCLOSURE OF FEDERAL PARTICIPATION IN PAYMENT OF TERRORISM LOSSES
Under your coverage, any losses resulting from certified acts of terrorism may be partially reimbursed by the United States Government under a formula established by the Act, as amended. Under the formula, the United States Government generally reimburses 85% of covered terrorism losses exceeding the statutorily established deductible paid by the Insurance Company providing the coverage. The Act, as amended, contains a $100 billion cap that limits U.S. Government reimbursement as well as insurers' liability for losses resulting from certified acts of terrorism when the amount of such losses exceeds $100 billion in any one calendar year. If the aggregate insured losses for all insurers exceed $100 billion, your coverage may be reduced.

All other provisions of this policy remain unchanged and in full force and effect.

AGENT OR BROKER NAME AND ADDRESS

**Willis Marine North America
32255 Northwestern Highway
Farmington Hills, MI 48334**

CONTINENTAL INSURANCE COMPANY

TRIA MARINE R1   (ed. 01/08)

## Gibson Guitar

**Willis**

## CONFIRMATION OF EXCESS STOCK INSURANCE

| | |
|---|---|
| **PRIMARY INSURANCE COMPANY:** | Continental Insurance Company (CNA) |
| **EXCESS INSURANCE COMPANY:** | Mitsui Sumitomo Insurance Company of America |
| **POLICY NO.:** | OCMM001058 |
| **EFFECTIVE:** | January 1, 2010 policy open and continuous until cancelled by either party giving Ninety (60) days notice. |
| **ASSURED:** | Gibson Guitar Corporation |
| **LIMITS OF LIABILITY:** | $15,000,000 in excess of $10,000,000 any one location, any one occurrence. (Stock only) |
| **LOCATIONS:** | • Baldwin Piano Plant, 900 Hwy. #463 S. Trumann, AR 72472-9604 <br> • Electric, 641 Massman Dr., Nashville, TN 37210 <br> • Baldwin Dongbei, Bohai Street, Yinkou, Liaoning, China <br> • Deutsche Wurlitzer, Wurlitzer 6, Hullhorst, Germany |
| **TERMS & CONDITIONS:** | Subject to all other terms, clauses and conditions as per underlying policy, including amendments thereto or without notice and to follow absolutely all settlement. Such settlements being binding on all participating underwriters hereon. |
| **FLAT ANNUAL PREMIUM:** | $10,000 |
| **COMMISSION:** | 10% |

Mitsui Sumitomo Ins. Co. of America

Underwriter Signature / Date

*Note: This binder is intended as a summary and should only be utilized as a representation of the policy's general terms and conditions. The actual policy must be referred to for a proper and thorough determination of its provisions and for any coverage analysis.*

EXHIBIT
B